[Cite as *State v. Smith*, 2017-Ohio-9283.]

### IN THE COURT OF APPEALS OF OHIO

### TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| State of Ohio, | : | |
| Plaintiff-Appellee, | : | |
| v. | : | No. 16AP-21<br>(M.C. No. 2015 CRB 20017) |
| Michael D. Smith, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

### D E C I S I O N

### Rendered on December 28, 2017

**On brief:** *Richard C. Pfeiffer, Jr.,* City Attorney, and *Orly Ahroni*, for appellee City of Columbus. **Argued:** *Orly Ahroni.*

**On brief:** *Yeura R. Venters*, Public Defender, and *John W. Keeling*, for appellant. **Argued:** *John W. Keeling.*

APPEAL from the Franklin County Municipal Court

HORTON, J.

{¶ 1} Defendant-appellant, Michael D. Smith ("Smith"), appeals from a jury verdict finding him guilty of aggravated menacing, disorderly conduct, and ethnic intimidation. For the reasons set forth below, we affirm in part and reverse in part.

### I. FACTUAL AND PROCEDURAL BACKGROUND

{¶ 2} On August 28, 2015, a five-count complaint was filed alleging that Smith had committed a series of misdemeanor offenses stemming from incidents at a California Fitness gym. The first count alleged that Smith had committed first degree misdemeanor assault, in violation of Columbus City Code 2303.13(A), when he knowingly attempted to cause physical harm to "Michael Harris, by means of charging after the victim to the point of having to be restrained by other members of the gym." The second count, aggravated

menacing, a first degree misdemeanor under Columbus City Code 2303.21, alleged that Smith knowingly caused Dana Rocco to believe that Smith would cause him serious physical harm when he threatened to shoot up the gym and in a subsequent email correspondence. The third count also alleged aggravated menacing based on similar events, but identified a different person, Sean H. Scott, as the victim. The fourth count was ethnic intimidation, a first degree misdemeanor under Columbus City Code 2331.08(A). It alleged that Smith had violated Columbus City Code 2303.22 by committing menacing when he "ran up to Michael Harris in a violent manor [sic] and attempted to assault said victim, and the reason or one of the motives, reasons or purposes for the commission of the offense was the victim's sexual orientation." The final count, a fourth degree misdemeanor charge of disorderly conduct under Columbus City Code 2317.11(A), also identified Michael Harris as the victim. It alleged that Smith had "recklessly cause[d] inconvenience, annoyance & harm" to Harris "by threatening harm to [his] person and engaging in violent or turbulent behavior" when Smith "charged after the victim to do bodily harm and [had] to be restrained." (Aug. 28, 2015 Compl.)

{¶ 3}   Smith entered a plea of not guilty to the charges on September 4, 2015, and requested a trial by jury. (Sept. 4, 2015 Demand for Jury Trial.) The trial commenced on January 4, 2016. Sean Scott, the alleged victim of one of the aggravated menacing charges, did not testify, and that charge was dismissed. (Jan. 4, 2016 Tr.; Jan 8, 2016 Entry.)

{¶ 4}   The prosecution's first witness was Michael Harris. Harris testified that he was gay and had been a gym member since 2014. (Jan. 4, 2016 Tr. at 20-21.) On August 23, 2015, Harris was working out at the gym. On his way to an exercise machine, he said hi to Laverne Kemp, an acquaintance with whom he had not socialized outside of the gym. Kemp was working out on a treadmill next to Smith. (Tr. at 16-17.) Harris began to listen to music on his headphones while working out, but heard "someone yelling," although he could not make out the words. (Tr. at 18.) He turned around and saw Smith running on his treadmill while looking at him, and Kemp stopping her machine with a worried look on her face. *Id.* Harris then saw Smith jump off of his treadmill and "come after" him at "high speed." (Tr. at 18-19.) Harris testified that he felt "threatened" by Smith's body language, as his face looked angry and there was "a lot of huffing and puffing coming from him." (Tr. at 19.) Harris then removed his headphones and heard Kemp and

another person ask Smith to calm down and grab him. *Id.* Harris testified that he did not know Smith, and had never seen or spoken to him before. (Tr. at 16, 23.)

{¶ 5} Laverne Kemp also testified about the incident. She stated that she was a corrections officer who had worked at Madison Correctional Institution for over 18 years. (Tr. at 34.) She described Harris as a "nice kid" that she talked to at the gym. (Tr. at 35-36.) On August 23, 2015, she was on a treadmill running when Harris walked by and said hi to her. Smith and another man were on treadmills on either side of her. (Tr. at 36.) After Harris passed by, Kemp testified that Smith started to scream that he "hate[d] fags, he'd kill all the fags," and would not "go in the locker room no more because of all the fags in there," even though "[n]obody had done anything to" Smith. (Tr. at 37.) Kemp said that she and the man on the other side of Smith "just kind of looked at him because we didn't know why he just went crazy." (Tr. at 37-38.) At first she was "stunned," but then realized that Smith was talking about Harris. (Tr. at 38.) Kemp saw Harris get up, take his headphones off, start to approach them, but then turned around and walked away. At that point, Smith "jumped off his treadmill" and said that he wanted to ask Harris if he wanted to "fight him" before starting to approach him. (Tr. at 39.) Kemp and the other man restrained Smith, who then went back to his treadmill. *Id.* Kemp described Smith as "enraged," and stated that Smith had gone "from zero to a hundred in a second." (Tr. at 40-41.) After the incident, Kemp found Harris in the activity room, where she "tried to explain to him" that Smith had gone after him because he was gay. (Tr. at 42, 24.)

{¶ 6} Towards the end of her testimony, Kemp testified as follows:

> Q. All right. Do you know Mr. Smith?
>
> A. No.
>
> Q. Other than appearing in court?
>
> A. No.
>
> Q. You don't know Michael Harris other than being a gym member with him and coming to this court case, correct?
>
> A. I - - No, I ain't never - - I don't recall ever seeing him at a prison or anything that I was at, you know, that I work at, so, I don't know. He could have been at our prison before because there's two sides to our jail so he could have been in there. But

he did say when this incident was going on, and I told him that, he had been out for ten years.

(Tr. at 43.)

{¶ 7} Defense counsel objected to this statement as highly prejudicial to Smith and requested that it be stricken. (Tr. at 43, 50.) The prosecution claimed the statement was admissible as a statement by a party-opponent under Evid.R. 801(D). (Tr. at 44.) The trial court declined to strike the statement. (Tr. at 50.)

{¶ 8} After Kemp's testimony, the prosecution called Dana Rocco, the owner of the gym, as a witness. (Tr. at 70-71.) Rocco testified that he knew Smith, Harris, and Kemp. (Tr. at 73-74.) Sean Scott, a gym employee, reported to Rocco that Smith had come into the gym on August 25, 2015 and "threatened to shoot up all the faggots and gay people in the gym and just come shoot the gym up." (Tr. at 79.) After contacting a detective and the police, as well as talking to several people about the incident, Rocco decided to cancel Smith's gym membership. (Tr. at 74, 79, 90.) After unsuccessfully attempting to phone Smith, Rocco sent him an email stating that his membership had been terminated and a police report had been filed. (Tr. at 75; City's Ex. 1.)

{¶ 9} Rocco received what he described as a "very negative" response from Smith. (Jan. 4, 2016 Tr. at 76.) An email sent at 7:30 a.m. on August 26, 2015 from Smith read: "pussy ass honkey don't be sending me no mutha fuccin emails you fuccin HOMO. you bitch." (City's Ex. 1.) An email Smith sent four minutes later stated: "fuck your faggot ass gym you bitch. i will see you again. small world." (City's Ex. 2.)

{¶ 10} Rocco testified that the emails made him feel "stressed, scared" and threatened. (Jan. 4, 2016 Tr. at 78.) Based on the contents of the emails and the incident from the previous day, Rocco believed that Smith's threat was credible. *Id.* The police visited the gym the next couple mornings "to make sure nothing happened," and about 50 members canceled their memberships after hearing about the threat. (Tr. at 79-80.) Rocco testified that he was scared and continued to be scared that "something's going to happen." (Tr. at 80.)

{¶ 11} The prosecution's final witness was Larry Wilson, a detective from the Columbus Police Department. (Tr. at 105-08.) He testified that Rocco contacted him about Smith's threat and the incident with Harris. (Tr. at 110.) Wilson stated that he

interviewed witnesses, including Kemp. He stated that Kemp "was pretty credible, because she does this for a living. She has -- like cops, she reads people." (Tr. at 112.) Detective Wilson stated that his reaction to speaking to Harris was "yeah, he was telling me a story and I'm like, okay, okay, I believe you there. I believe you there. I believe you there. I believe you to a certain point." *Id.* Wilson then stated that he felt that he did not need to interview Smith about the allegations because he "got enough" after talking to Kemp: "I'm talking to someone that again does this for a living. She reads people like I do. If you work inside a prison or you're a guard, your life depends on it, you have to be able to read people. You see their intentions, you read their body language." (Tr. at 114.) Smith's attorney objected to each of these remarks, or attempted to, and each objection was overruled. (Tr. at 112, 114.)

{¶ 12} On redirect, the prosecution elicited the following statement from Wilson:

> Then when you go to a person that has higher credibility, in my opinion, someone that has been sworn like myself to uphold the law like the Lavern lady, her's was the strongest to me, all the rest, okay, yeah, I hear what you're saying, but she's independent. She had nothing to lose or gain either way. She's used to seeing situations and evaluating them and telling you what she saw. When she said it, I was convinced at that point.

(Tr. at 128.)

{¶ 13} Smith presented no witnesses or evidence. The jury did not return a verdict on the assault charge, but did return guilty verdicts on the charges of aggravated menacing, ethnic intimidation, and disorderly conduct. (Jan. 8, 2016 Jury Verdict.)

{¶ 14} On appeal, Smith asserts the following assignments of error:

> [I.] THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT WHEN THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN THE CONVICTION.
>
> [II.] THE TRIAL COURT ERRED WHEN IT ENTERED JUDGMENT AGAINST THE DEFENDANT AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
>
> [III.] THE TRIAL COURT ERRED WHEN IT ALLOWED HEARSAY EVIDENCE OF OTHER ACTS TO BE ADMITTED INDICATING THAT THE DEFENDANT HAD

THREATENED TO SHOOT GAY PEOPLE IN THE GYM AND TO SHOOT UP THE GYM IN VIOLATION OF THE RULES OF EVIDENCE AND THE CONFRONTATION CLAUSES OF THE UNITED STATES AND OHIO CONSTITUTIONS, THEREBY DEPRIVING THE DEFENDANT OF HIS RIGHT TO A FAIR TRIAL AND DUE PROCESS OF LAW.

[IV.] THE TRIAL COURT ERRED WHEN IT ALLOWED THE CITY TO PRESENT EVIDENCE IN ITS CASE IN CHIEF, OVER OBJECTION, THAT THE DEFENDANT HAD SPENT TIME IN PRISON AS EVIDENCE OF THE DEFENDANT'S CHARACTER AND PROPENSITY TO COMMIT CRIME AND TO ESTABLISH THAT IT MADE IT MORE LIKELY THAT HE COMMITTED THE INSTANT OFFENSES BECAUSE OF HIS AGGRESSIVE CHARACTER AND DISREGARD OF THE LAW AS REFLECTED BY THE FACT THAT HE HAD SERVED TIME IN PRISON.

[V.] THE DEFENDANT WAS DEPRIVED OF HIS RIGHT TO A FAIR TRIAL AND DUE PROCESS OF LAW WHEN A POLICE OFFICER WAS ALLOWED TO TESTIFY AT GREAT LENGTH ABOUT HIS PERSONAL BELIEFS REGARDING THE DEFENDANT'S GUILT AND THE CREDIBILITY OF WITNESSES FOR THE CITY.

[VI.] THE TRIAL COURT ERRED WHEN IT FAILED TO INSTRUCT THE JURY ON THE REQUIRED MENTAL INTENT REQUIRED TO SUSTAIN A CONVICTION FOR ETHNIC INTIMIDATION UNDER THE COLUMBUS CITY CODE.

{¶ 15} As explained in more detail below, the fourth and fifth assignments of error will be sustained in part and overruled in part. The charges of ethnic intimidation and disorderly conduct will be vacated and this cause remanded for a new trial on those charges. We must still address the legal challenges and the conviction for aggravated menacing raised in the first, second, and third assignments of error, but the sixth assignment of error will be overruled as moot.

## II. FIRST AND SECOND ASSIGNMENTS OF ERROR

{¶ 16} Challenges to the legal sufficiency of evidence and the manifest weight of evidence require the application of different legal standards. *See State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), paragraph two of the syllabus ("The legal concepts of sufficiency of the evidence and weight of the evidence are both quantitatively and

qualitatively different."). Whether the evidence is legally sufficient to sustain a verdict is a question of law. *State v. Jennings*, 10th Dist. No. 09AP-70, 2009-Ohio-6840, ¶ 37, citing *Thompkins*. "Sufficiency is a test of adequacy." *Id.* "The standard when testing the sufficiency of the evidence ' "is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." ' " *State v. Beverly*, 143 Ohio St.3d 258, 2015-Ohio-219, ¶ 15, quoting *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, ¶ 70, quoting *State v. Jenks,* 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. A reviewing court "will not disturb a verdict on appeal on sufficiency grounds unless 'reasonable minds could not reach the conclusion reached by the trier-of-fact.' " *State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, ¶ 94, quoting *State v. Dennis*, 79 Ohio St.3d 421, 430 (1997).

{¶ 17} The manifest weight of the evidence analysis, on the other hand, requires the appellate court to consider the state's evidence as an additional or "thirteenth juror." *Thompkins* at 387. After "reviewing the entire record," the appellate court " 'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Id.*, quoting *State v. Martin*, 20 Ohio App.3d 172 (1st Dist.1983). " 'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Id.*, quoting *Martin.*

{¶ 18} Smith's brief engages in a lengthy discussion of First Amendment principles and appears to argue that whatever anti-gay sentiments he expressed did not amount to "true threats" that were constitutionally acceptable to punish him for uttering. (Appellant's Brief at 18-23.) To the extent that Smith presents either an as-applied or facial constitutional challenge to the ethnic intimidation ordinance in Columbus City Code 2331.08(A) on First Amendment grounds, we reject such a challenge. The city's ethnic intimidation ordinance prohibits a person from violating any number of other ordinances, including the underlying offense of menacing with which Smith was charged, "by reason of or where one of the motives, reasons or purposes for the commission of the offense is the victim's race, sex, sexual orientation, gender identity or expression, color, religion,

national origin, ancestry, age, disability, familial status or military status." Columbus City Code 2331.08(A). We have previously held that Columbus City Code 2331.08(A) and R.C. 2927.12, Ohio's "general law prohibiting ethnic intimidation," are "in all material respects identical" to one another except for the city ordinance's inclusion of sexual orientation. *Columbus v. Spingola*, 144 Ohio App.3d 76, 81 (10th Dist.2001). *See also State ex rel. King v. Summit Cty. Council*, 99 Ohio St.3d 172, 2003-Ohio-3050, ¶ 41-42 (noting the *Spingola* holding). It is well-settled that R.C. 2927.12 "is constitutional under the United States and Ohio Constitutions." *State v. Wyant*, 68 Ohio St.3d 162 (1994), syllabus (following *Wisconsin v. Mitchell*, 508 U.S. 476 (1993)). Furthermore, Smith fails to understand the basis of the criminal charge against him by arguing that his words did not qualify as "true threat[s]." (Appellant's Brief at 21.) The state did not introduce evidence of anti-gay remarks made by Smith to prove the actus reus of a criminal offense. Rather, such evidence proved that "one of the motives, reasons or purposes" of the underlying offense of menacing was the victim's sexual orientation. Columbus City Code 2331.08(A).

{¶ 19} Smith also challenges the ethnic intimidation conviction on the grounds that Harris did not actually hear the anti-gay remarks Smith made. Harris testified that although he "could hear someone yelling," he "couldn't make out the words" because he was listening to music through his headphones. (Tr. at 18.) However, there is no requirement in Columbus City Code 2331.08(A) that the victim actually hear discriminatory language from a defendant. The ethnic intimidation ordinance is concerned with the defendant's motive, while the underlying offense contains the element of injury to the victim that a prosecutor must prove. Through Kemp's testimony describing Smith's anti-gay remarks made at the time he threatened Harris, the city provided adequate evidence to support its allegation that Harris' sexual orientation was the motive or purpose of the offense.

{¶ 20} Furthermore, the underlying offense of menacing provides that "[n]o person shall knowingly cause another to believe that the offender will cause physical harm to the person or property of such other person or member of his immediate family." Columbus City Code 2303.22(A). Through Harris' testimony, the city proved that Smith caused Harris to believe that Smith was going to cause him physical harm. Based on Smith's "facial expression and body language," Harris believed that Smith was going to

attack him. (Tr. at 22.) Harris' testimony was legally sufficient to prove the offense of menacing. Accordingly, we reject Smith's argument that the city's evidence was legally insufficient to prove the ethnic intimidation charge.

{¶ 21} For similar reasons, we also disagree with Smith's contention that the complaint of ethnic intimidation was deficient because it failed to allege that he had "uttered any spoken threat" to the victim. (Appellant's Brief at 25.) Under Crim.R. 3, a complaint must contain a "statement of the essential facts constituting the offense charged." "The purpose of a complaint filed in a criminal case is to provide reasonable notice to the defendant of the nature of the offense." *State v. Andrews*, 10th Dist. No. 98AP-1098 (1999), citing *State v. Sweeney*, 72 Ohio App.3d 404, 406 (10th Dist.1991). "A complaint provides sufficient notice to the defendant by including the nature of the offense, the time and place of the alleged offense, the statutory language, the statute number, and a brief description of the conduct alleged, thus stating all of the essential elements of the offense." *Id.* Here, the complaint for ethnic intimidation alleged that Smith:

> At Franklin County/Columbus, Ohio, on or about the 23rd day of August, 2015 did: violate City Code 2303.22, menacing, to wit: ran up to Michael Harris in a violent manor [sic] and attempted to assault said victim, and the reason or one of the motives, reasons or purposes for the commission of the offense was the victim's sexual orientation.

(Aug. 28, 2015 Compl.)

{¶ 22} The utterance of spoken threat is not a required element of ethnic intimidation under Columbus City Code 2331.08(A). Smith was on notice that the city intended to prove that Harris' sexual orientation motivated Smith to commit menacing. The city identified the victim, the date, and jurisdictional location of the offense. The language of the complaint tracked the ethnic intimidation statute and referenced the underlying offense. This was sufficient to provide reasonable notice to Smith of the nature of the charge against him. *See State v. Buehner*, 110 Ohio St.3d 403, 2006-Ohio-4707 (holding that an indictment stating that the appellee "did violate Section 2903.21 of the Revised Code by reason of race, color, religion, or national origin of another person or group of persons" provided the appellant with adequate notice of the charges against him under Ohio's ethnic intimidation statute).

{¶ 23} Smith's sole argument concerning the aggravated menacing charge references his arguments made in the third assignment of error, in which he asserts that the city failed to prove its case because it depended on erroneously admitted hearsay statements. Because we reject those arguments in the third assignment of error, they cannot support a determination that the aggravated menacing conviction was based on legally insufficient evidence or the manifest weight of the evidence. Accordingly, the first and second assignments of error are overruled.

## III. THIRD ASSIGNMENT OF ERROR

{¶ 24} Smith's third assignment of error alleges that the trial court erred by allowing Dana Rocco to testify regarding the threats that Sean Scott stated that Smith had made because the testimony amounted to inadmissible hearsay. (Appellant's Brief at 30-39.) In response, the city argues that the statements were admissible as either non-hearsay threats that qualified as "verbal acts" or double hearsay where each layer fell within an exception to the hearsay rule. (Appellee's Brief at 17-28.)

{¶ 25} Evid.R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." The Staff Notes to Evid.R. 801(C) elaborate on the definition as follows:

> Hearsay is limited to statements offered into evidence to prove the truth of the assertion by the declarant not on the witness stand at the time of the declaration. The definition discloses its relative nature. If a statement is not offered to prove its truth but is offered for some other reason such as simply to prove the statement was made, if such fact is relevant, it is not hearsay. *Words constituting conduct are not hearsay*, e.g., words of a contract, libel, slander, threats and the like.

(Emphasis added.)

{¶ 26} Moreover, under Evid.R. 805, "[h]earsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules."

{¶ 27} In this case, Rocco's testimony was admissible because the statement attributed to Smith was admissible at each stage at which the statement was subject to a hearsay challenge. First, Smith's initial statement to Scott, in which he "threatened to

shoot up all the faggots and gay people in the gym and just come shoot the gym up," was not hearsay. (Tr. at 79.) The statement was not offered to prove the truth of the matter it asserted because Smith never committed a mass shooting of the gym's homosexual patrons. Rather, the statement was a threat—"[w]ords constituting conduct [that] are not hearsay," according to the Staff Notes to Evid.R. 801(C). In addition, Smith's statement to Scott was also not hearsay because it was a statement by a party opponent under Evid.R. 801(D)(2).

{¶ 28} Second, the statement from Scott to Rocco was admissible as an "excited utterance" exception to the rule against hearsay under Evid.R. 803(2). The rule states: "A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." The exception applies "regardless of whether the declarant is available as a witness." Evid.R. 803. The Supreme Court of Ohio has set forth the following test for determining whether a statement qualifies as an excited utterance under Evid.R. 803(2):

> Testimony as to a statement or declaration may be admissible under an exception to the hearsay rule for spontaneous exclamations where the trial judge reasonably finds (a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement or declaration spontaneous and unreflective, (b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties, so that such domination continued to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, (c) that the statement or declaration related to such startling occurrence or the circumstances of such startling occurrence, and (d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration.

State v. Duncan, 53 Ohio St.2d 215, 217 (1978), paragraph one of the syllabus.

{¶ 29} Here, Smith's threat to commit a shooting at the gym was "startling enough to provide a nervous excitement" in Scott, the declarant, so that the declaration to Rocco

was "spontaneous and unreflective." *Duncan* at 217. Because Scott called Rocco and reported the threat immediately after Smith made it, the declaration "was made before there had been time for such nervous excitement to lose a domination over his reflective faculties." *Id.* Scott's declaration "related to such startling occurrence" because he repeated to Rocco what Smith had threatened to do. *Id.* Finally, Scott was present when Smith made the threat, and therefore personally observed it. Accordingly, the statement from Scott to Rocco qualified as an exception to the rule against hearsay under Evid.R. 803(2). Smith's assertion of error in the admission of this statement is not well-taken. The third assignment of error is overruled.

## IV. FOURTH ASSIGNMENT OF ERROR

{¶ 30} In the fourth assignment of error, Smith argues that the trial court improperly allowed Kemp's mention of his prison record into evidence, and that the statement was inadmissible character evidence under Evid.R. 404(B). (Appellant's Brief at 40-43.)

{¶ 31} The city responds by pointing out that the prosecutor's question that prompted Kemp's response actually referenced Michael Harris, the victim, and not Michael Smith, the defendant. Thus, the city asserts that the prosecutor did not actually introduce evidence that Smith had been in prison. (Appellee's Brief at 34-35.)

{¶ 32} "The admission or exclusion of relevant evidence rests within the sound discretion of the trial court." *State v. Sage*, 31 Ohio St.3d 173 (1987), paragraph two of the syllabus.

{¶ 33} Before reaching Smith's argument, we must address the city's assertion that this assignment of error should be overruled because the prosecutor's question actually referred to the victim, Michael Harris, instead of the defendant, Michael Smith. After a series of questions concerning Kemp's recollection of Smith's presence in the gym, the following exchange occurred:

Q. All right. Do you know Mr. Smith?

A. No.

Q. Other than appearing in court?

A. No.

Q. You don't know Michael Harris other than being a gym member with him and coming to this court case, correct?

A. I - - No, I ain't never - - I don't recall ever seeing him at a prison or anything that I was at, you know, that I work at, so, I don't know. He could have been at our prison before because there's two sides to our jail so he could have been in there. But he did say when this incident was going on, and I told him that, he had been out for ten years.

(Tr. at 43.)

{¶ 34} It is unlikely that the jury understood the prosecutor's last question and Kemp's answer as referring to anyone other than Smith. The victim and Smith have the same first name, Michael, a fact that continually caused confusion during the trial. (Tr. at 51, 55.) The prosecutor unquestionably misspoke, as the final question served as a confirmation and summation of the previous questions about Smith and his presence in the gym. When discussing the objection to Kemp's statement, the attorneys and the judge all assumed that the last question had referenced Smith. (Tr. at 44-50.) The judge even started the discussion by saying: "just so the record's clear, in my opinion, the witness was just about - - just sort of saying that *the defendant* told her he'd done some time in prison and there was an objection." (Emphasis added.) (Tr. at 44.) Given that everyone conducting the trial believed that the prosecutor had asked about Smith, it is likely the jury did as well, and it therefore heard the question and Kemp's answer as they were intended. To overrule the assignment of error for the reason offered by the city would prioritize form over substance.

{¶ 35} During the discussion of the objection, the trial court acknowledged that Kemp's statement was "highly prejudicial," but nevertheless refused to strike the testimony because Smith himself had "made the statement" that Kemp recounted. (Tr. at 44, 50.) Thus, the trial court apparently accepted the prosecution's argument that the statement was admissible as an admission by a party-opponent under Evid.R. 801(D)(2), over the objection of Smith's attorney that the statement was inadmissible character evidence under Evid.R. 404(B).

{¶ 36} Evid.R. 404(B) states:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in

conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

{¶ 37} Smith's purported statement, as recounted by Kemp, was that he had been out of prison for ten years before the incident in question. This statement amounted to evidence that Smith had previously committed some crime or wrong. The prosecution asserted that the statement was admissible to show intent and motive, but failed to explain how the fact that Smith had served some unspecified time in prison for an unknown crime ten years before related to the intent or motive of any crime that he was currently on trial for. (Tr. at 48.) Tellingly, the prosecution also argued that Smith's statement "demonstrate[d] the defendant's demeanor" and "how aggressive he was at the scene." (Tr. at 47-48.) This argument shows that the prosecution wanted to use Smith's admission that he had a prison record to prove that he had acted in conformity with an aggressive demeanor. This is precisely the type of character evidence that is inadmissible under Evid.R. 404(B). The trial court erred by allowing Kemp's statement to be admitted.

{¶ 38} More fundamentally, the statement was inadmissible because it was completely irrelevant. Only relevant evidence is admissible, while irrelevant evidence is not admissible. Evid.R. 402. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401. The trial court stated that it was "trying to figure out how this is valuable to the elements of the offense that he's been to prison," but provided no subsequent explanation of the statement's relevancy. (Tr. at 47.) Whether Smith had been to prison ten years before had no tendency to make any fact that tended to prove the city's case more or less probable. Notably, the city has not defended the admissibility of the statement in this appeal on any grounds argued by the prosecutors at trial or accepted by the trial court. Regardless of whether a statement takes the form of an admission of a party opponent, and is possibly admissible under Evid.R. 801(D)(2), the statement must be relevant to be admissible. In this case, it was not relevant, and, as the trial court stated, "highly prejudicial." (Tr. at 47.)

{¶ 39} The admission of improper character evidence under Evid.R. 404(B) is subject to harmless error analysis. *State v. Morris*, 141 Ohio St.3d 399, 408, 2014-Ohio-5052. Under harmless error analysis, "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Crim.R. 52(A). In *Morris*, the Supreme Court held that when "determining whether to grant a new trial as a result of the erroneous admission of evidence under Evid.R. 404(B), an appellate court must consider both the impact of the offending evidence on the verdict and the strength of the remaining evidence after the tainted evidence is removed from the record." *Morris* at 408.

{¶ 40} Standing alone, the admission of Kemp's statement may have been harmless. However, Kemp went on to say the following during cross-examination:

> A. Well, I'm going to say this, because I've been [working] in the prison for a long time. When somebody is at the - - the state that he - - the state of mind that he was in at that moment, yes, if me and that other guy wouldn't have stopped him, it probably would have been an assault.
>
> Q. Probably?
>
> A. Yes.
>
> Q. Because that's what happens in prison.
>
> A. Well, I'm going to say this. He told me that he was in Allen for ten years.
>
> Q. That's not - -
>
> A. So that's what he said. That's what he told me.

(Tr. at 57.)

{¶ 41} Although the trial court did instruct the jury to disregard Kemp's "last comment," the substance of Kemp's statement went beyond her assertion that he had been in prison. (Tr. at 58.) Kemp explicitly linked Smith's "state of mind" to that of the prisoners she dealt with at the prison and asserted that her experience with them gave her the knowledge to understand Smith. This equivalency between Smith and the prisoners goes significantly beyond the mere mention of prior bad acts. Furthermore, as discussed in the next assignment of error, Detective Wilson's improper bolstering of Kemp's credibility during his testimony was another source of prejudice to Smith. In particular,

Detective Wilson cited Kemp's experience as a prison guard as evidence of her judge of character, which she referenced in her assessment of Smith's mental state.

{¶ 42} Because Detective Wilson's testimony so colored the jury's assessment of Kemp, we cannot say that the charges of ethnic intimidation and disorderly conduct, both of which depended on her testimony, could withstand removing all of their prejudicial statements from the record. However, the evidence to support the aggravated menacing charge with Dana Rocco as a victim did not depend on Kemp's testimony, and was sufficiently strong to render harmless any prejudice created by Detective Smith or Kemp. Accordingly, Smith's fourth assignment of error is sustained in part and overruled in part. The assignment of error is sustained with regards to Smith's convictions for ethnic intimidation and disorderly conduct, but overruled with regards to the aggravated menacing charge.

## V. FIFTH ASSIGNMENT OF ERROR

{¶ 43} In his fifth assignment of error, Smith argues that Detective Wilson's testimony deprived him of a fair trial and violated due process because Wilson improperly opined about Smith's guilt and the credibility of the witnesses. Smith points to numerous examples of statements made by Wilson where the detective expressed opinions about how the witnesses' statements and the emails corroborated each other, the credibility of Laverne Kemp, and Smith's guilt and mischaracterizations of his criminal record. (Appellant's Brief at 44-45.)

{¶ 44} In response, the City points out that because Detective Wilson did not opine about the credibility of Rocco, the aggravated menacing charge identifying him as a victim is not implicated by this assignment of error. (Appellee's Brief at 36.) The city states that it "concedes that it was improper for Detective Wilson to offer an opinion as to the truthfulness of Laverne Kemp," but contends that the error was harmless because defense counsel cross-examined her, allowing the jury "to perceive her credibility firsthand and decide for themselves whether she was being truthful." (Appellee's Brief at 40-41.) The city further argues that other statements made by Detective Wilson should be subjected to plain error analysis because they were not individually objected to, and that many of the statements were not prejudicial because they were in the nature of testimony about

"police evidence-gathering procedures rather than an expressed opinion on a witness's veracity." (Appellee's Brief at 42-45.)

{¶ 45} Under Evid.R. 701, the testimony of a lay witness "in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." An abuse of discretion standard applies to a trial court's decision to admit testimony under Evid.R. 701. *Urbana ex rel. Newlin v. Downing*, 43 Ohio St.3d 109, 113 (1989); *State v. Griffin*, 10th Dist. No. 10AP-902, 2011-Ohio-4250, ¶ 58.

{¶ 46} "On the trial of a case, either civil or criminal, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967), paragraph one of the syllabus. "In our system of justice it is the fact finder, not the so-called expert or lay witnesses, who bears the burden of assessing the credibility and veracity of witnesses." *State v. Eastham*, 39 Ohio St.3d 307, 312 (1988). Opinion testimony regarding another witness's credibility "infringe[s] upon the role of the fact finder, who is charged with making determinations of veracity and credibility." *Id.* Thus, "the opinion of a witness as to whether another witness is being truthful is inadmissible." *State v. Potter*, 8th Dist. No. 81037, 2003-Ohio-1338, ¶ 38, citing *State v. Miller*, 2d Dist. No. 18102 (Jan. 26, 2001). *See also State v. Pawlak*, 8th Dist. No. 99555, 2014-Ohio-2175, ¶ 113, citing *State v. Kovac*, 150 Ohio App.3d 676, 2002-Ohio-6784, ¶ 32 (2d Dist.) (noting that "lay witnesses are prohibited from testifying as to another witness's veracity"). When such testimony is admitted, it is subject to a harmless error analysis on review. *State v. Roush*, 10th Dist. No. 12AP-201, 2013-Ohio-3162, ¶ 61-62; *State v. Bush*, 10th Dist. No. 90AP-1190 (Oct. 3, 1991).

{¶ 47} Under harmless error analysis, "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Crim.R. 52(A). There are "two requirements that must be satisfied before a reviewing court may correct an alleged error." *State v. Fisher*, 99 Ohio St.3d 127, 2003-Ohio-2761, ¶ 7. "First, the reviewing court must determine whether there was an 'error'--i.e., a 'deviation from a legal rule.' " *Id.*, quoting *United States v. Olano*, 507 U.S. 725, 732-33 (1993). "Second, the reviewing court must engage in a specific analysis of the trial court record--a so-called "harmless error"

inquiry--to determine whether the error 'affected substantial rights' of the criminal defendant." *Id.* To affect substantial rights, the error must be prejudicial, in that it affected the outcome of the trial. *Id.*

{¶ 48} The city concedes that Detective Wilson's opinion testimony was "improper." (Appellee's Brief at 40.) A more forthright description is that the trial court erred by allowing him to provide his opinions, particularly at such length and without any constraints. Detective Wilson offered multiple glowing assessments of Kemp's credibility. She was apparently "pretty credible" because she was a corrections officer, which, in Detective Wilson's eyes, meant that "like cops, she reads people." (Tr. at 112.) According to Detective Wilson, Kemp was so credible that he not only believed Harris's report of the events after talking to her, but he felt no obligation to contact Smith or get his side of the story to complete his investigation. He had "got[ten] enough" evidence from Kemp, who was "a person that has higher credibility, in my opinion, someone that has been sworn like myself to uphold the law," who was "independent" with "nothing to lose or gain either way." (Tr. at 128.) After talking to Kemp, Detective Wilson "was convinced at that point." *Id.*

{¶ 49} Detective Wilson's flagrant bolstering of Kemp's credibility goes far beyond what we have previously determined constitutes prejudicial error. In *Bush*, a prosecutor asked a detective to "elaborate" on his use of the word "hesitant" when describing a witness's reaction when asked to identify the defendant in a photo array. The detective responded: "I referred to hesitant as when a witness appears to be scared or frightened and he's trying to avoid telling me the truth" or if he "fears retaliation" by cooperating with police. *Id.* The identifying witness, who was subjected to cross-examination, testified that he hesitated when identifying the defendant "because he feared retaliation." *Id.* We found that the detective's "testimony amounted to his giving an impermissible opinion as to the credibility of a particular witness's testimony." *Id.* Furthermore, because the case "strictly depended upon the credibility of the witnesses," the detective's statement was prejudicial: "To have allowed a police officer to bolster a key witness's credibility by an opinion as to truthfulness, under the totality of the circumstances, was prejudicial error." *Id.*

{¶ 50} Allowing Detective Wilson's praise of Kemp's credibility and judge of character to continue at such length was prejudicial to Smith. Given that Kemp was the only witness to the anti-gay epithets that supported the city's ethnic intimidation charge, we cannot conclude that the error was harmless. As discussed in the previous assignment of error, her testimony was also crucial to the disorderly conduct charge. However, the aggravated menacing charge did not depend on her testimony. Accordingly, the fifth assignment of error is sustained in part and overruled in part.

## VI. SIXTH ASSIGNMENT OF ERROR

{¶ 51} Because Smith's conviction for ethnic intimidation will be vacated, we overrule as moot the assignment of error asserting error in the drafting of the jury instruction on this charge.

## VII. CONCLUSION

{¶ 52} For the foregoing reasons, the first, second, and third assignments of error are overruled. The fourth and fifth assignments of error are sustained in part and overruled in part. They are sustained concerning Smith's convictions for ethnic intimidation and disorderly conduct, but overruled regarding his conviction for aggravated menacing. Accordingly, the convictions for ethnic intimidation and disorderly conduct are vacated and this cause remanded for a new trial on those charges. The conviction for aggravated menacing is affirmed. Finally, the sixth assignment of error is overruled as moot.

*Judgment affirmed in part and reversed in part; cause remanded.*

BROWN, J., concurs.
SADLER, J., concurring in part and dissenting in part.

SADLER, J., concurring in part and dissenting in part.

{¶ 53} I concur with the majority's holding in the first, second, third, and sixth assignments of error. I disagree with the majority's holding in the fourth assignment of error that the admission of Laverne Kemp's alleged prior acts statement is not harmless. For the fifth assignment of error, I concur with the majority's holding in regard to the ethnic intimidation conviction but disagree with the majority's holding that Detective Larry Wilson's improper bolstering of Kemp's credibility warrants reversal of the

disorderly conduct conviction. Accordingly, I respectfully concur in part and dissent in part.

{¶ 54} For purposes of clarity, I will begin by addressing the fifth assignment of error. In the fifth assignment of error, the majority opinion finds Wilson's bolstering of Kemp's credibility constitutes error and is not harmless in regard to both the disorderly conduct and ethnic intimidation convictions. The city concedes that Wilson's opinion testimony regarding Kemp was improper.

{¶ 55} In my opinion, the error in admitting Wilson's opinion testimony on Kemp's credibility was harmless as to appellant's conviction for disorderly conduct. As noted by the majority, only those prejudicial errors that affected the substantial rights of the criminal defendant, in other words, errors that affected the outcome of the trial, warrant reversal for a new trial. *State v. Fisher*, 99 Ohio St.3d 127, 2003-Ohio-2761, ¶ 7.

{¶ 56} First, I note the jury did not return a verdict on the assault charge, a charge in which the city attempted to prove appellant "knowingly" attempted to cause physical harm to Michael Harris largely based on Kemp's testimony as to her opinion of appellant's state of mind. I believe the jury's no-verdict result on the assault charge demonstrates that Kemp's credibility had a low impact on its overall verdict. *State v. Armengau*, 10th Dist. No. 14AP-679, 2017-Ohio-4452, ¶ 77 ("[T]he jury's decision to reject some counts as to certain accusers, and all counts as to others, again indicates that the jury did not allow the contested evidence to taint the overall verdict.").

{¶ 57} Second, unlike the ethnic intimidation charge, evidence other than Kemp's testimony supports the disorderly conduct conviction. Disorderly conduct under Col. City Code 2317.11(A) required the city to prove appellant recklessly caused inconvenience, annoyance, and harm to Harris by threatening harm to his person and engaging in violent or turbulent behavior by charging Harris and needing to be restrained. Harris testified while he was working out on a treadmill at a gym, appellant, someone Harris did not know and had not seen before, jumped off his treadmill and came after Harris at a high speed "huffing and puffing" with an angry look on his face. (Tr. at 19.) Harris testified he felt threatened by appellant's body language, and Kemp and another person grabbed appellant and asked him to calm down. I believe Harris's testimony alone supports the disorderly conduct conviction.

{¶ 58} Therefore, unlike the majority, I do not believe Kemp's bolstered credibility was prejudicial to appellant in regard to the disorderly conduct verdict. As a result, I would overrule the fifth assignment of error in regard to the disorderly conduct and affirm that conviction.

{¶ 59} Under the fourth assignment of error, the majority holds the trial court's admission of Kemp's contention that "Michael Harris" previously served prison time constitutes reversible error. (Tr. at 43.) In my opinion, whether a prior act statement *about appellant* was made in the first place is questionable. I do not believe it is out of the realm of possibility that the jury understood the prosecutor's question about "Michael Harris" to elicit a response about Michael Harris.

{¶ 60} Regardless, the admission of Kemp's statement is harmless error. As noted by the majority, in *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5042, syllabus, the Supreme Court of Ohio states in determining whether to grant a new trial as a result of the erroneous admission of evidence under Evid.R. 404(B), an appellate court must consider both "the impact of the offending evidence on the verdict and the strength of the remaining evidence after the tainted evidence is removed from the record."

{¶ 61} In my opinion, the impact of Kemp's statement was low. Even if the prosecutor meant to say appellant's name and Kemp's response was about appellant, Kemp actually said the victim's name, Michael Harris. The name mix up, at minimum, is confusing. The jury could have thought Kemp was stating the victim had a record, resulting in prejudice to the victim rather than appellant. In addition, the prosecutor did not solicit the remark or emphasize the point in front of the jury; the prosecutor's statements to the judge out of the jury's hearing are not prejudicial. *State v. Barnes*, 8th Dist. No. 92512, 2010-Ohio-1659, ¶ 38. Furthermore, I believe the remaining evidence, Harris's testimony in particular, is strong and supports appellant's conviction for disorderly conduct. Therefore, I would find, on this record, the admission of Kemp's statement constitutes harmless error in regard to the disorderly conduct conviction. Because I agree with the majority in sustaining appellant's fifth assignment of error in regard to the ethnic intimidation conviction, appellant's argument regarding ethnic intimidation in the fourth assignment of error is rendered moot.

{¶ 62} Considering all the above, I would overrule appellant's first, second, third, and fourth assignments of error, overrule in part and sustain in part appellant's fifth assignment of error, and overrule appellant's sixth assignment of error as moot. The fifth assignment of error would be sustained in part concerning appellant's conviction for ethnic intimidation but overruled in part regarding his convictions for disorderly conduct and aggravated menacing. Accordingly, I would affirm appellant's convictions for disorderly conduct and aggravated menacing, vacate appellant's conviction for ethnic intimidation, and remand this cause for a new trial on that charge. Because the majority holds otherwise, I concur in part and dissent in part.

_____