[Cite as *Columbus v. Fabich*, 2020-Ohio-7011.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| City of Columbus, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 19AP-441 |
| v. | : | (M.C. No. 2018CRB-23744) |
| Sean Fabich, | : | (REGULAR CALENDAR) |
| Defendant-Appellant. | : | |

D E C I S I O N

Rendered on December 31, 2020

**On Brief:** *April F. Campbell*, for appellant. **Argued:** *April F. Campbell.*

**On Brief:** *Zachary M. Klein,* City Attorney, *Bill R. Hedrick,* and *Orly Ahroni,* for appellee. **Argued:** *Orly Ahroni.*

APPEAL from the Franklin County Municipal Court

BRUNNER, J.,

{¶ 1} Defendant-appellant, Sean Fabich, appeals a judgment of the Franklin County Municipal Court issued on June 27, 2019, following a jury verdict, convicting him of one count of disorderly conduct and one count of ethnic intimidation and sentencing him to serve 60 days in jail, 30 days on house arrest, and suspending a further 90 days of jail time on condition of 2 years of probation. Because we find that the slur commonly known as the "n-word" is a "fighting word" when uttered under the circumstances in this case, we affirm Fabich's conviction for disorderly conduct. We further find that plaintiff-appellee's, City of Columbus's, ethnic intimidation ordinance, as applied to a predicate offense of disorderly conduct, is constitutional because it does not punish the content of fighting words but instead punishes the biased motive or reason for the fighting words being uttered without regard to the content of the words. Fabich's repeated utterance of racially charged fighting words and other racially charged words demonstrates that a motive underlying the

disorderly conduct was racial. Consequently, we affirm Fabich's conviction for ethnic intimidation as sufficiently supported and not against the manifest weight of the evidence. We find that the trial court erred by failing to permit Fabich to allocute and plainly erred by failing to sentence on each offense of conviction. We accordingly decline to address as moot whether the record supported the trial court's sentencing restriction that Fabich not own or reside with animals. We overrule Fabich's first, second, third, fourth, and fifth assignments of error. We sustain his sixth assignment of error. And we find moot his seventh assignment of error.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} On November 21, 2018, a complainant-victim, Willis Brown, filed a pair of complaints against Fabich alleging that, on November 1, 2018, Fabich had repeatedly called Brown, "Nigger[1] Brown," and told him to "go back to the plantation." (Nov. 21, 2018 Compls. at 1, 3.) The complaints charged violations of Columbus City Code, Sections 2317.11(A)(2) (disorderly conduct) and 2331.08(A) (ethnic intimidation). *Id.* Fabich apparently pled "not guilty" the same day (though the plea form is unsigned and contains only the typed name and contact information for Fabich's counsel). (Nov. 21, 2018 Plea Form.)

{¶ 3} Prior to trial, Fabich moved to dismiss the case, arguing that even if the complaints were taken at face-value, the ordinances that he was charged with violating were unconstitutional under the First Amendment to the U.S. Constitution. (Apr. 11, 2019 Mot. to Dismiss.) The City filed a memorandum contra and the parties orally argued the motion before voir dire on the first day of trial. (May 15, 2020 Memo. Contra; May 20, 2019 Hearing & Voir Dire Tr. at 2-11.) The trial court denied the motion and the case proceeded to trial. (May 20, 2019 Hearing & Voir Dire Tr. at 2-11.)

{¶ 4} At trial, four witnesses testified and a video showing a portion of the encounter between Brown and Fabich was introduced as an exhibit.[2] The complainant, Willis Brown, was the first to testify.

---

[1] Because the impact of this word is a question within this case, where it appears as a portion of a direct quote, we shall repeat the word as it was said. However, in all other instances we shall refer to it as the "n-word."

[2] The transcript of the trial that took place beginning on May 21, 2019, was prepared in two consecutively paginated volumes. Due to the consecutive pagination, we find it unnecessary to cite the volume number and shall merely reference the relevant page number. For example, (Tr. at 25).

{¶ 5} Brown testified that he lived on North Monroe Avenue and was a Near East Area Commissioner for his neighborhood. (Tr. at 29-34.) Fabich, he said, was a long-time neighbor who lived on the same street approximately one block away. (Tr. at 37.) Brown recounted that he and another neighbor, Dana Moessner, were admiring landscaping that Moessner had done for Fabich's next door neighbor when Fabich pulled up in his car. (Tr. at 38.) According to Brown, Fabich got out of the car and expressed the opinion that Brown and Moessner (who was also an area commissioner) were not good commissioners. (Tr. at 40.) Brown said he and Moessner ignored Fabich. *Id.* Fabich then stated that Brown was just a "nigger" and that from then on, according to Fabich, his name would be "Nigger Brown." *Id.* Brown said Fabich, who was about 20 feet away, repeated the slur many times, that Brown felt the statements were made in an attempt to provoke him, and that he, in fact, felt provoked. (Tr. at 40-44.) Brown said he verbally responded, demanding respect, but did not respond physically. (Tr. at 42-45.) Yet, he admitted that, given the provocation offered by Fabich, he was tempted to engage physically. (Tr. at 42-44.)

{¶ 6} During Brown's direct testimony, video of a portion of the altercation was played. (Tr. at 50-52, 88; City's Ex. 1.) The video, recorded from across the street and through some trees, shows an indistinct figure (whom the parties agree was Fabich) placing potted plants around his property. (City's Ex. 1 in passim.) The sounds in the video are somewhat distant and difficult to decipher, but Fabich can be heard to repeatedly say, "Bye Nigger Brown," "go away, Nigger Brown," and other similar remarks to someone off screen. *Id.* in passim. The person off screen (whom the parties apparently do not dispute was Willis Brown) can be heard shouting back at intervals urging Fabich to "be respectful" and not to "call people names." *Id.* at 1:06-1:09, 1:21-1:28. At one point, Fabich tells the person off screen, "Go back to your plantation." *Id.* at 0:14-0:21. At another point, he appears to say, "If you're calling me Tarzan, you're Nigger Brown." *Id.* at 0:56-1:02. Later he says, "If you're going to make fun of my whiteness, we're going to have it out." *Id.* at 1:19-1:22. Shortly before the end of the recording, Fabich says, "You called me Tarzan. Let's have some race fun." *Id.* at 1:43-1:47.

{¶ 7} On cross-examination, Brown agreed that Fabich had, at one point, been involved in the community in a beneficial way and that he had known Fabich for quite a number of years. (Tr. at 55-56.) However, when asked if it was safe to say that he did not

particularly care for Fabich, Brown said he did not know how to answer. (Tr. at 54.) Brown testified that he did not recall having offered any insult to Fabich but, even after the video was played repeatedly, claimed not to have heard the portion of the video where Fabich referenced having been called names because he was white. (Tr. at 45, 65-71.)

{¶ 8} The next witness to testify was Brian Waderker, who lives directly across North Monroe Avenue from Fabich. (Tr. at 90.) Waderker testified that he was awakened inside his home (the windows were open) by the sound of people yelling racial slurs. (Tr. at 91-92.) He looked out the window to see if everything was okay, heard what Fabich was saying, and decided to start recording, shooting the video that became City Exhibit 1. (Tr. at 92-93.) Waderker testified that the interaction between Fabich and Brown had probably been occurring for about five minutes before he started recording. (Tr. at 93.) Waderker, who had known Fabich and Brown as neighbors for many years, said he felt "a little disappointed" by what he heard Fabich saying. (Tr. at 93, 96.) Waderker confirmed that he heard Fabich call Brown "Nigger Brown" and tell him to "go back to [his] plantation." (Tr. at 93-95.) He also agreed that Fabich said, "If you're going to call me Tarzan, I'm going to call you Nigger Brown." (Tr. at 100.) Waderker said that he found the slavery references to be somewhat threatening but that he was mostly disappointed and did not, based on what he heard, feel compelled to involve himself in an altercation. (Tr. at 103-04, 107-08.)

{¶ 9} The final witness for the City was Dana Moessner, who also lives on North Monroe Avenue and, like Brown, was on the Near East Area Commission. (Tr. at 109.) Moessner said the incident began as he and Brown were standing together near the residence next door to Fabich and that Fabich began the incident by calling Brown "Nigger Brown" before Brown had said anything. (Tr. at 111.) Moessner testified that, based on his facial expressions, Brown appeared shocked, surprised, and bewildered. (Tr. at 112-13.) Moessner said that Brown did not get physically aggressive or move toward Fabich even though Fabich was being very verbally abusive, and Moessner was appalled by what he heard Fabich say. (Tr. at 123-24, 129.) Moessner testified that neither he nor Brown responded verbally to Fabich. (Tr. at 111-13, 120-21.)

{¶ 10} Fabich was the last witness to testify and the only witness to testify for the defense. (Tr. at 180.) He explained that he also lives on North Monroe Avenue and that, on the day in question, he had been driving around purchasing various shrubberies to plant

at his home. (Tr. at 180, 191.) Fabich testified that he was engaged in unloading these plants from his car in front of his house when Brown told him, "Tarzan, get your white ass back in the house." (Tr. at 193.) Fabich testified that "Tarzan" is a derogatory term for a white person living in a predominantly black community and that he knew this because Brown had spelled it out for him on prior occasions and because Fabich had looked it up. (Tr. at 195, 201-02, 212.) Fabich said that there had been bad feelings between him and Brown for some time prior to the events underlying the case. (Tr. at 212.) Fabich said the "Tarzan" remark set him off and that he was not fully cognizant of what he was saying during the interaction with Brown as he continued to place his shrubberies. (Tr. at 196-97.) He agreed that the video did not show the alleged "Tarzan" remark by Brown and opined that that was "convenient." (Tr. at 209-10.) He testified that though he felt the "Tarzan" remark was intended to put him in his place, it did not justify calling Brown the n-word and that he regretted having done so. (Tr. at 197, 204-07.) Fabich said that although he insulted Brown, he repeatedly told Brown to go home because he wanted him to leave, not because he was intending to provoke a fight. (Tr. at 211-12.)

{¶ 11} During the course of instructing the jury, the trial court gave the following instruction on causation:

> Causation. Cause is an -- is an essential element of the offense. Cause is an act or failure to act which in a natural and continuous sequence directly produces the physical harm to person and without which it would not have occurred.

(Tr. at 245-46.) During deliberations, the jury asked a question, "Does causation always require/imply physical harm as the definition of caution states?" (Tr. at 255.) At the time the question was posed, the trial court declined to offer further instructions, despite argument by the City that physical harm was an inappropriate inclusion in the instruction. (Tr. at 255-58.) However, on May 28, following further briefing and argument from the City about the erroneous nature of the instruction, the trial court gave the jury a revised causation instruction:

> Cause is an essential element of the offense. Cause is an act or failure to act, which, in a natural and continuous -- continuous sequence, directly produces the inconvenience, annoyance, or alarm to another by making an offensively coarse utterance, gesture or display or by communicating unwarranted and grossly abusive language to any person when the words are

likely, by their very utterance, to inflict injury or to provoke the average person to an immediate breach of the peace and without which it would not have occurred.

(May 28, 2019 Reinstruction Hearing Tr. at 19.)

{¶ 12} Shortly after the revised instruction was given, the jury reached a verdict finding Fabich guilty of both ethnic intimidation and disorderly conduct. *Id.* at 20-21; May 28, 2019 Verdict Forms.

{¶ 13} On June 26, 2019, the trial court sentenced Fabich. (June 26, 2019 Sentencing Tr.) During the sentencing hearing, the trial court asked if there were any preliminary matters and the parties indicated there were none. (June 26, 2019 Sentencing Tr. at 4-5.) However, the trial court did not specifically inquire if Brown or Fabich wished to say anything and neither Brown nor Fabich was given the opportunity to speak before the trial court pronounced sentence. *Id.* at 4-6. On request of the prosecution, Brown was permitted to speak after the sentence was imposed. *Id.* at 10. Other than saying "good morning" at the outset of the proceeding, Fabich remained silent throughout the sentencing. *Id.* at 2, in passim.

{¶ 14} The trial court ultimately sentenced Fabich to 60 days in jail (with 17 days of jail-time credit), 30 days on house arrest, and suspended a further 90 days of jail time on condition of 2 years of probation. (June 26, 2019 Sentencing Tr. at 5-6; June 27, 2019 Entry.) The trial court did not designate which offense corresponded with which part of the sentence or pronounce individual sentences for each crime. One of the specified terms of probation was that Fabich not own any animals or reside where animals are present. (June 27, 2019 Entry at 2.)

{¶ 15} Fabich now appeals.

## II. ASSIGNMENTS OF ERROR

{¶ 16} Fabich presents seven assignments of error for review:

[1.] Fabich's Ethnic Intimidation conviction should be reversed because it impermissibly regulates content-based speech.

[2.] Fabich's Ethnic Intimidation conviction should be reversed because the code is constitutionally vague and overbroad.

[3.] Fabich's convictions should be reversed because they are unconstitutional as applied to him.

[4.] The trial court committed reversible error by changing the jury instructions on the third day of deliberation.

[5.] The evidence against Fabich was legally insufficient and weighed manifestly against his convictions.

[6.] The trial court abused its discretion by not allowing for allocution at Fabich's sentencing.

[7.] The trial court abused its discretion by imposing a probation condition that Fabich not own animals or reside where animals are present.

## III. DISCUSSION

### A. First, Second, and Third Assignments of Error - Whether the Ethnic Intimidation and Disorderly Conduct Ordinances are Unconstitutional, Especially when Predicated On a Purely Speech-Based Incident

### 1. Introduction and Caselaw History of Ethnic Intimidation in Ohio

{¶ 17} The ethnic intimidation ordinance, Columbus City Code Section 2331.08, is an additional offense that can be added to the prosecution of a predicate or underlying offense where the victim's race, sex, sexual orientation, gender identity or expression, color, religion, national origin, ancestry, age, disability, familial status or military status is a motive, reason, or purpose for the offense. This City code section provides:

(A) No person shall violate Sections 2303.13 [assault], 2303.22 [menacing], 2307.06 [sexual imposition], 2309.06 [criminal damaging or endangering], 2309.07 [criminal mischief], 2311.21 [criminal trespass], 2313.02 [theft], 2313.03 [unauthorized use of a vehicle], 2313.04 [unauthorized use of property], 2317.03 [riot], 2317.11 [disorderly conduct], 2317.12 [disturbing a lawful meeting], 2323.30 [discharging weapons], or 2329.01 [littering], of the Columbus City Codes, by reason of or where one of the motives, reasons or purposes for the commission of the offense is the victim's race, sex, sexual orientation, gender identity or expression, color, religion, national origin, ancestry, age, disability, familial status or military status.

* * *

(C) Whoever violates this section is guilty of ethnic intimidation, a misdemeanor of the first degree. If the underlying offense which is a necessary element of ethnic intimidation is itself a misdemeanor of the first degree, then upon conviction under this section, the court shall impose a

mandatory minimum sentence of at least ten (10) days imprisonment. If the offender has previously been convicted under either this section or Section 2927.12, Ohio Revised Code and the underlying offense is a first degree misdemeanor or the offense resulted in physical harm to any person, then upon conviction under this section the court shall impose a mandatory minimum sentence of at least ninety (90) days imprisonment.

Columbus City Code Section 2331.08(A) and (C).

{¶ 18} The ordinance has a greater number of listed prohibited motives and a greater number of possible predicate offenses but is otherwise similar to the ethnic intimidation offense found in Ohio Revised Code Section 2927.12, which provides:

(A) No person shall violate section 2903.21 [aggravated menacing], 2903.22 [menacing], 2909.06 [criminal damaging or endangering], or 2909.07 [criminal mischief], or division (A)(3), (4), or (5) of section 2917.21 [menacing and threats to damage or trespass via telecommunications harassment] of the Revised Code by reason of the race, color, religion, or national origin of another person or group of persons.

(B) Whoever violates this section is guilty of ethnic intimidation. Ethnic intimidation is an offense of the next higher degree than the offense the commission of which is a necessary element of ethnic intimidation.

R.C. 2927.12.

{¶ 19} In 1992, the Supreme Court of Ohio considered the constitutionality of the state crime of ethnic intimidation under R.C. 2927.12, based on a predicate offense of aggravated menacing. *State v. Wyant*, 64 Ohio St.3d 566, 566-67 (1992). In that case, the Court held that R.C. 2927.12 was facially unconstitutional because it criminalized not only the predicate criminal act but also the thought, motive, or reason for the action. *Wyant*, 64 Ohio St.3d at 577, in passim. The *Wyant* decision was justified, in significant part, by the United States Supreme Court decision in *R. A. V. v. St. Paul*, 505 U.S. 377 (1992), and the Supreme Court of Wisconsin decision in *State v. Mitchell*, 169 Wis.2d 153, 485 N.W.2d 807 (1992). The Supreme Court of Ohio summarized those cases and explained its reasoning in *Wyant* as follows:

The United States Supreme Court recently addressed the constitutionality of another so-called "hate crimes" law. *R.A.V.*

*v. St. Paul* (1992), 505 U.S.   , 112 S. Ct. 2538, 120 L. Ed. 2d 305. The St. Paul ordinance reads:

" 'Whoever places on public or private property a symbol, object, appellation, characterization or graffiti, including, but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm or resentment in others on the basis of race, color, creed, religion or gender commits disorderly conduct and shall be guilty of a misdemeanor.' " *Id.*, 505 U.S. at   , 112 S. Ct. at 2541, 120 L. Ed. 2d at 315.

The St. Paul ordinance is aimed at specific conduct; that is, conduct which will arouse anger, alarm or resentment on the basis of race, color, creed, religion or gender. The Minnesota Supreme Court rejected an overbreadth claim because the ordinance had been construed to include only unprotected "fighting words." Despite this construction, the United States Supreme Court found the ordinance facially unconstitutional under the First Amendment. Justice Scalia, writing for the court, said that even the few limited categories of unprotected speech are not "entirely invisible to the Constitution." *Id.* at   , 112 S. Ct. at 2543, 120 L. Ed. 2d at 318. The government may not regulate even fighting words based on a hostility toward the message they contain. Any proscription of fighting words must not be based on content. The court observed that the St. Paul ordinance went beyond content discrimination to viewpoint discrimination.

Quite recently the Supreme Court of Wisconsin struck down the Wisconsin "hate crimes" statute as "unconstitutionally infring[ing] upon free speech." *State v. Mitchell* (1992), 169 Wis.2d 153,   , 485 N.W.2d 807, 808. The Wisconsin law is a penalty-enhancement statute with some similarities to R.C. 2927.12. The Wisconsin statute does not use the phrase "by reason of," but instead permits a penalty enhancement for certain crimes when the defendant "[i]ntentionally selects" the victim "because of the race, religion, color, disability, sexual orientation, national origin or ancestry" of the victim. Wis.Stat. 939.645 (1989-90). Despite this wording, the Wisconsin court said: "[The statute] is expressly aimed at the bigoted bias of the actor. Merely because the statute refers in a literal sense to the intentional 'conduct' of selecting, does not mean the court must turn a blind eye to the intent and practical effect of the law -- punishment of offensive motive or thought." *Id.* at   , 485 N.W.2d at 813. The analysis by the Wisconsin court applies with greater force to the Ohio statute. R.C. 2927.12 refers to the

> actor's reasons in direct, rather than indirect, terms and is more clearly aimed at punishment of bigoted thought.
>
> R.C. 2927.12 constitutes a greater infringement on speech and thought than either the St. Paul or Wisconsin "hate crimes" laws. R.C. 2927.12 specifically punishes motive, and motive alone, not action or expression. The Ohio statute singles out racial and religious hatred as a viewpoint to be punished. It is the regulation of viewpoint that most particularly violates the Ohio and federal Constitutions.

*Wyant*, 64 Ohio St.3d at 578-79.

{¶ 20} However, the United States Supreme Court granted writs of certiorari in both *Mitchell* and *Wyant* and reversed both. *Wisconsin v. Mitchell*, 508 U.S. 476 (1993); *Ohio v. Wyant*, 508 U.S. 969 (1993). The Supreme Court reasoned that, while it is not permissible to punish offensive abstract beliefs, it is permissible to punish (as valid hate-crime statutes do) based on the repugnant nature of a motive for a criminal act. *Mitchell*, 508 U.S. at 485-87. In *Mitchell*, the United States Supreme Court also distinguished and narrowed the *R. A. V.* decision:

> Nothing in our decision last Term in *R. A. V.* compels a different result here. That case involved a First Amendment challenge to a municipal ordinance prohibiting the use of " 'fighting words' that insult, or provoke violence, 'on the basis of race, color, creed, religion or gender.' " 505 U.S. at 391 (quoting St. Paul Bias-Motivated Crime Ordinance, St. Paul, Minn., Legis. Code § 292.02 (1990)). Because the ordinance only proscribed a class of "fighting words" deemed particularly offensive by the city -- i.e., those "that contain . . . messages of 'bias-motivated' hatred," 505 U.S. at 392 -- we held that it violated the rule against content-based discrimination. *See id.*, at 392-394. But whereas the ordinance struck down in *R. A. V.* was explicitly directed at expression (i.e., "speech" or "messages"), *id.*, at 392, the statute in this case is aimed at conduct unprotected by the First Amendment.

*Mitchell*, 508 U.S. at 487. In other words, the United States Supreme Court drew a distinction: It is permitted for a government to specially penalize the repugnant motives for illegal conduct (including racial bias). But, even within the category of fighting words, a government is not free to directly regulate the content of speech with an aim to prefer some content over other content.

{¶ 21} After United States Supreme Court intervention, the Supreme Court of Ohio changed course in the *Wyant* case and held (without any reasoning or discussion) that the state ethnic intimidation statute, R.C. 2927.12, was constitutional. *See State v. Wyant*, 68 Ohio St.3d 162, 164 (1994). In a recent case, we noted the similarity between R.C. 2927.12 and the municipal ordinance at issue in Fabich's case. *State v. Smith*, 10th Dist. No. 16AP-21, 2017-Ohio-9283, ¶ 18. Because *Smith*, like *Wyant*, concerned an ethnic intimidation case predicated on menacing, we did not cite or analyze the impact of *R. A. V.*; we merely applied *Wyant* with the result that we summarily rejected arguments that the ordinance was facially unconstitutional or unconstitutional as applied. *Smith*, 2017-Ohio-9283, at ¶ 18.

{¶ 22} However, the case before us now presents a new question in some respects. Unlike any prior case in Ohio, Fabich's conviction of ethnic intimidation is predicated on his conviction for disorderly conduct under Columbus City Code Section 2317.11(A)(2). That offense provides:

> (A) No person shall recklessly cause inconvenience, annoyance, or alarm to another, by doing any of the following:
>
> * * *
>
> (2) Making unreasonable noise or offensively coarse utterance, gesture, or display, or communicating unwarranted and grossly abusive language to any person[.]

Columbus City Code Section 2317.11(A)(2). In other words, in this case, the hateful words themselves constitute the entirety of both the ethnic intimidation and the predicate offense. This distinction is not only factual, it is legal. Columbus City Code Section 2331.08(A) creates an offense of ethnic intimidation based on the predicate offense of disorderly conduct, but R.C. 2927.12 does not. *Compare* R.C. 2927.12(A) (not listing disorderly conduct, R.C. 2917.11, as a predicate offense) *with* Columbus City Code Section 2331.08(A) (listing Columbus City Code Section 2317.11, disorderly conduct, as a predicate offense). Thus, while *Wyant*, *Smith*, and *Mitchell* are instructive, none of them is summarily dispositive of the basic questions running through this case: Can the Government make it a crime to address someone using fighting words? Is the n-word a fighting word? If the n-word is a fighting word and the government can generally prohibit fighting words, can it also make it a separate and more serious crime to direct such a fighting word at another

person "by reason of or where one of the motives, reasons or purposes for the [utterance was] the victim's race?"  Columbus City Code Section 2331.08(A).

## 2.  Whether the Disorderly Conduct Ordinance is Constitutional

{¶ 23} The First Amendment generally prevents government from proscribing speech, *see, e.g., Cantwell v. Connecticut*, 310 U.S. 296, 309-11 (1940), or even expressive conduct, *see, e.g., Texas v. Johnson*, 491 U.S. 397, 406 (1989), because of disapproval of the ideas expressed.  Content-based regulations are presumptively invalid.  *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 115 (1991); *id.* at 124 (Kennedy, J., concurring in judgment); *Consolidated Edison Co. of New York. v. Public Serv. Comm. of New York.*, 447 U.S. 530, 536 (1980); *Police Dept. of Chicago v. Mosley*, 408 U.S. 92, 95 (1972).  However, restrictions on the content of speech have been generally permitted to proscribe a few categories of speech, including what is known as "fighting words."  The United States Supreme Court has defined these as follows:

> There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem.  These include the lewd and obscene, the profane, the libelous, and the insulting or "fighting" words -- those which by their very utterance inflict injury or tend to incite an immediate breach of the peace.  It has been well observed that such utterances are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.  "Resort to epithets or personal abuse is not in any proper sense communication of information or opinion safeguarded by the Constitution, and its punishment as a criminal act would raise no question under that instrument."

(Footnotes omitted.) *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942), quoting *Cantwell*, 310 U.S. at 309-10.

{¶ 24} Obviously, a prohibition on causing "inconvenience, annoyance, or alarm" by an "offensively coarse utterance, gesture, or display, or communicating unwarranted and grossly abusive language to any person," would reach much more than mere "fighting words" if taken literally.  Columbus City Code Section 2317.11(A)(2)  However, in accordance with federal precedent on the limited "fighting words" category, the Supreme Court of Ohio has confirmed that, "[a] person may not be punished under [the disorderly

conduct statute] for 'recklessly caus[ing] inconvenience, annoyance, or alarm to another,' by making an 'offensively coarse utterance' or 'communicating unwarranted and grossly abusive language to any person,' unless the words spoken are likely, by their very utterance, to inflict injury or provoke the average person to an immediate retaliatory breach of the peace." *State v. Hoffman*, 57 Ohio St.2d 129 (1979), paragraph one of the syllabus (following *Cincinnati v. Karlan*, 39 Ohio St.2d 107 (1974)). These holdings apply with equal force to the language in the ordinance, Columbus City Code Section 2317.11(A)(2). Hence, despite the overbroad language of the ordinance, because caselaw has limited the application of the ordinance, the City can and does make it a crime to confront another person with "fighting words."

### 3. Whether the N-Word is a Fighting Word

{¶ 25} We find that, where, as here, the n-word is insultingly applied to a black person (particularly in conjunction with remarks like, "go back to the plantation"), it amounts to an utterance of fighting words. Although the Seventh District Court of Appeals has expressed the view that the n-word is not a fighting word, nationwide precedent is generally to the opposite effect. *Compare State v. Dotson*, 7th Dist. No. 93 C.A. 250, 1995 WL 750147, 1995 Ohio App. LEXIS 5567, *4-5 (Dec. 13, 1995) ("Words such as 'Uncle Tom' and 'Nigger' are not fighting words. Even though the use of such words is totally abhorrent to all people, the words, by themselves, do not rise to the level of criminal behavior. Although such words may be offensive to persons of all races, they do not provoke a reasonable person to an immediate retaliatory breach of the peace.") *with*, *e.g.*, *State v. Hoshijo*, 102 Haw. 307, 76 P.3d 550, 564-65 (2003) (holding that, in conjunction with threat to "kick ass," the use of "nigger" is a fighting word); *United States v. Ybarra*, 57 M.J. 807, 811-12 (U.S. Navy-Marine Corps.Ct.Crim.App.2002) (finding that the n-word directed toward a black person is "among the vilest of all racial epithets" and that, in conjunction with other obscenities, constituted fighting words); *In re John M.*, 201 Ariz. 424, 36 P.3d 772, 776 (Ct.App.2001) (noting that "few words convey such an inflammatory message of racial hatred and bigotry as the term 'nigger,' " that "the term is 'generally regarded as virtually taboo because of the legacy of racial hatred that underlies the history of its use among whites, and its continuing use among a minority as a viciously hostile epithet,' " and concluding that the defendant's "direction of the word 'nigger' to [] an African-American woman[] constituted a personal attack on her that was likely to provoke a violent reaction");

*Bailey v. State*, 334 Ark. 43, 972 S.W.2d 239, 244-45 (1998) (finding that, in conjunction with grabbing an officer's arm, saying "Fuck you, nigger, and fuck you, too," constituted fighting words); *Sims v. Montgomery Cty. Comm.*, 766 F.Supp. 1052, 1097, fn. 128 (M.D. Ala.1990) (recognizing that, "the term 'nigger' is often a 'fighting word' "). As the Supreme Court of North Carolina succinctly and accurately stated the matter, "[n]o fact is more generally known than that a white man who calls a black man a 'nigger' within his hearing will hurt and anger the black man, and often provoke him to confront the white man and retaliate." *In re Spivey*, 345 N.C. 404, 480 S.E.2d 693, 699 (1997) (approving a trial court having taken judicial notice that calling a black person the n-word in the course of a confrontation was a fighting word).

{¶ 26} Thus, it was not unconstitutional for Fabich to be charged and convicted of the fourth-degree misdemeanor disorderly conduct for directing fighting words at Brown. *See* Columbus City Code Section 2317.11(A) and (E). But, even having settled that question, we must still confront the constitutional issues surrounding ethnic intimidation.

### 4. Whether the Ethnic Intimidation Ordinance is Unconstitutional

{¶ 27} The United States Supreme Court has observed, "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). "In the First Amendment context, [the Supreme Court has also] recognize[d] 'a second type of facial challenge,' whereby a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.' " *United States v. Stevens*, 559 U.S. 460, 473 (2010), quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449, fn. 6 (2008). The City ordinance does not fail facially because it has a broad plainly legitimate sweep in cases where the predicate offenses consist of non-speech criminal conduct. *See Washington v. Glucksberg*, 521 U.S. 702, 740, fn. 7 (1997) (Stevens, J., concurring). Nor is it vague on its face—it clearly apprises the reader that persons in Columbus are especially forbidden from committing any of the predicate offenses for listed categories of bigoted reasons. *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983). Moreover, other higher courts have already upheld similar laws facially and we have facially upheld this very ordinance. *Mitchell*, 508 U.S. in passim;

*Wyant*, 68 Ohio St.3d at 164; *Smith*, 2017-Ohio-9283, at ¶ 18. Thus, we turn to considering whether, as applied to Fabich and his speech in this case, the ordinance is unconstitutional.

{¶ 28} In this case, the City has convicted Fabich of ethnic intimidation based on his having uttered racially charged fighting words to a black person. Columbus City Code Section 2331.08(A) and (C). Hypothetically, had Fabich confronted Brown with different fighting words that disclosed no racial bias, he might have instead been found guilty only of disorderly conduct, not ethnic intimidation. Columbus City Code Section 2317.11(E). That juxtaposition seems, at first, to place this situation squarely within the reach of *R. A. V.*'s prohibition on regulating the content of fighting words. *R. A. V.*, 505 U.S. at 385-86.

{¶ 29} However, another hypothetical leads us in a different direction: What if Fabich had confronted Brown with fighting words that were not racially charged but then, after the fact, confessed that his motive for verbally attacking Brown had been racial? In that case, despite having uttered no biased fighting words, could he still have been found guilty of ethnic intimidation based on the unbiased fighting words in conjunction with his confessedly biased motive for having uttered them? This hypothetical line of reasoning highlights the fact that the triggering culpability element in the ethnic intimidation ordinance is not the *content* of the fighting words, but rather, it is the "*motives, reasons or purposes for*" which the fighting words were uttered. (Emphasis added.) Columbus City Code Section 2331.08(A).

{¶ 30} In other words, assuming arguendo that the City successfully proved a bigoted motive for Fabich' directing fighting words toward Brown, then the ordinance is constitutional as applied to him. The ordinance does not seek to punish his use of the n-word more severely compared to other fighting words. It punishes a bigoted motive for employing fighting words against Brown, without regard to what those words were. *Mitchell* and *Wyant* inform that it is permissible for a government to add to the punishment of crimes where the criminal acts were committed due to a repugnant or socially destabilizing (for example, racist) motive. *See Mitchell*, 508 U.S. at 487, in passim. Thus, even as applied to Fabich (assuming a bigoted motive), we find that the City's ethnic intimidation ordinance is constitutional.

{¶ 31} We consequently overrule Fabich's first, second, and third assignments of error.

**B. Fourth Assignment of Error - Whether the Trial Court Erred by Orally Clarifying the Jury Instructions During Deliberation**

{¶ 32} Fabich argues that the trial court erred when it corrected the jury instructions during deliberation and especially since the City failed to object before the jury retired to deliberate. (Fabich's Brief at 19-21.) Part of Fabich's argument in his fourth assignment of error relies on Ohio Revised Code 2945.10, which set rules regarding the "Order of proceedings of trial." In part, potentially relevant to this case, that statute provides:

> The court, after the argument is concluded and before proceeding with other business, shall forthwith charge the jury. Such charge shall be reduced to writing by the court if either party requests it before the argument to the jury is commenced. *Such charge, or other charge or instruction provided for in this section, when so written and given, shall not be orally qualified, modified, or explained to the jury by the court.* Written charges and instructions shall be taken by the jury in their retirement and returned with their verdict into court and remain on file with the papers of the case.

(Emphasis added.) R.C. 2945.10(G). However, pursuant to Article IV of the Ohio Constitution, the Supreme Court of Ohio has rulemaking authority to govern the practice and procedure in all courts in the state. Ohio Constitution, Article IV, Section 5(B). "All laws in conflict with such rules shall be of no further force or effect after such rules have taken effect." *Id.* Consequently, the proper authority for Fabich's argument regarding jury instruction procedure (which he also cites) is Crim.R. 30. *State v. Mayle*, 7th Dist. No. 14 BE 39, 2015-Ohio-4838, ¶ 16-18; *State v. Kersey*, 124 Ohio App.3d 513, 519-20 (1st Dist.1997); *State v. Mitchell*, 8th Dist. No. 45014, 1983 WL 5738, 1983 Ohio App. LEXIS 13743, *19 (Feb. 3, 1983).

{¶ 33} Crim.R. 30 provides, in relevant part as follows:

> At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. Copies shall be furnished to all other parties at the time of making the requests. The court shall inform counsel of its proposed action on the requests prior to counsel's arguments to the jury and shall give the jury complete instructions after the arguments are completed. The court also

> may give some or all of its instructions to the jury prior to counsel's arguments. The court shall reduce its final instructions to writing or make an audio, electronic, or other recording of those instructions, provide at least one written copy or recording of those instructions to the jury for use during deliberations, and preserve those instructions for the record.
>
> On appeal, a party may not assign as error the giving or the failure to give any instructions unless the party objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection. Opportunity shall be given to make the objection out of the hearing of the jury.

Crim.R. 30(A). Though Fabich argues (based on the statute) that the trial court's subsequent correction to the jury instructions during deliberation was improper, several courts have noted that Crim.R. 30 does not prohibit a court from clarifying or explaining its instructions in response to jury questions (provided, of course, that the clarification or explanation is a correct statement of law). *State v. Blanda*, 12th Dist. No. 2013-06-109, 2014-Ohio-2234, ¶ 23; *State v. Hibbard*, 12th Dist. No. 2002-05-129, 2003-Ohio-5104, ¶ 11; *Kersey*, 124 Ohio App.3d at 520; *Mitchell*, 1983 Ohio App. LEXIS 13743, at *19. Thus, we do not agree that the trial court erred in this regard.

{¶ 34} Fabich observes that the City did not object to the definition of causation initially provided by the trial court to the jury (which included a reference to "physical harm"). (Tr. at 245-47, in passim). However, during deliberations the jury asked a question, "Does causation always require/imply physical harm as the definition of caution states?" (Tr. at 255.) At that time, the City weighed in and requested a clarification that physical harm was an inappropriate inclusion in the instruction on the facts of this case. (Tr. at 255-58.) While the trial court initially declined to offer further instructions, following additional briefing and argument from the City to better substantiate its argument about the erroneous nature of the original instruction, the trial court gave the jury a revised causation instruction. (May 23, 2019 Mot. for Reinstruction; May 24, 2019, Supp. Mot. for Reinstruction; May 28, 2019 Reinstruction Hearing Tr. at 19.) This is not, in other words, a case where a trial court simply entertained a belated objection in violation of Crim.R. 30. Rather, the jury asked a question. The parties (as is their right) weighed in on how the trial court should respond to the question. And the trial court (albeit not

immediately) decided the question warranted a clarification to its prior instructions. We see no error here. *See State v. Puma*, 11th Dist. No. 1215, 1985 Ohio App. LEXIS 8924, *4-7 (Sept. 27, 1985).

{¶ 35} We overrule Fabich's fourth assignment of error.

## C. Fifth Assignment of Error - Whether Fabich's Convictions were Insufficiently Supported or Contrary to the Manifest Weight of the Evidence

### 1. Standard

{¶ 36} The Supreme Court of Ohio has "carefully distinguished the terms 'sufficiency' and 'weight' * * *, declaring that 'manifest weight' and 'legal sufficiency' are 'both quantitatively and qualitatively different.' " *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380 (1997), paragraph two of the syllabus.

> Weight of the evidence concerns "the inclination *of the greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. * * * . Weight is not a question of mathematics, but depends on its *effect in inducing belief*."

(Emphasis sic.) *Eastley* at ¶ 12, quoting *Thompkins* at 387; *Black's Law Dictionary* 1594 (6th Ed.1990). In manifest weight analysis, "the appellate court sits as a 'thirteenth juror' and disagrees with the jury's resolution of the conflicting testimony." *Thompkins* at 388, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982). " 'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 37} In contrast, sufficiency is:

> "[A] term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." * * * In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law.

*Eastley* at ¶ 11, quoting *Thompkins* at 386; *Black's* at 1433. "In reviewing a record for sufficiency, '[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, ¶ 47, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

### 2. Disorderly Conduct

{¶ 38} Fabich argues that the evidence against him was insufficient to support, and manifestly against, his convictions for both disorderly conduct and ethnic intimidation because the evidence showed that he was on his own property and was provoked by Brown into uttering the slurs. (Fabich's Brief at 21-23.) As noted, a person commits disorderly conduct by recklessly causing inconvenience, annoyance, or alarm to another, by making an offensively coarse utterance or communicating unwarranted and grossly abusive language to any person, when the words spoken are likely, by their very utterance, to inflict injury or provoke the average person to an immediate retaliatory breach of the peace. *Hoffman*, 57 Ohio St.2d 129 at paragraph one of the syllabus; Columbus City Code Section 2317.11(A)(2). We have analyzed that the n-word, spoken under the circumstances in which Fabich uttered it, is a fighting word. Fabich's conviction for disorderly conduct was neither against the manifest weight of the evidence nor insufficiently supported. *See supra* at ¶ 22-25. No defense or legal justification exists for disorderly conduct that the fighting words may have been provoked. *State v. Linder*, 5th Dist. No. CA-8689, 1992 WL 28727, 1992 Ohio App. LEXIS 595, *4 (Feb. 10, 1992). Thus, Fabich's conviction for disorderly conduct is affirmed.

### 3. Ethnic Intimidation

{¶ 39} Ethnic intimidation would require a finding that Fabich committed disorderly conduct (which we previously addressed) "where one of the motives, reasons or purposes for the commission of the offense [was] the victim's race." Columbus City Code Section 2331.08(A). In other words, it is not enough that someone who becomes involved in an altercation utters racial slurs in the course of the altercation;[3] rather, the victim must

---

[3] In fact, if the mere use of a racial slur during an argument would justify a conviction for ethnic intimidation, then our basis for finding the ordinance to be constitutional would be undermined. *See supra* at ¶ 26-29.

be targeted "by reason" of their race or in this case their race must serve as one of the "motives, reasons or purposes for the commission of the offense."  Columbus City Code Section 2331.08(A).  To put it more plainly, becoming infuriated with someone for a non-racial reason and, in the course of that angry altercation, hurling a slur does not suffice to transform disorderly conduct into ethnic intimidation.  *See State v. Wochele*, 8th Dist. No. 106769, 2019-Ohio-1122; *State v. Chopak*, 8th Dist. No. 96947, 2012-Ohio-1537, ¶ 24; *State v. Kingery*, 2d Dist. No. 24063, 2012-Ohio-505, ¶ 20These cases help illustrate these points.

{¶ 40} In *Wochele*, an African-American couple became involved in an argument with a white man over parking arrangements.  2019-Ohio-1122, at ¶ 3-13.  Testimony in the trial varied, each side of the dispute denying having used racial slurs while asserting that the other side had used such slurs.  *Id.*  The Eighth District Court of Appeals found that, while the evidence supported a conviction for aggravated menacing, the evidence did not support a conviction for ethnic intimidation, reasoning as follows:

> [I]n the instant case, there is no evidence that [the defendant] sought out [the victim] because of his race, nor is there any evidence that [the defendant]'s menacing acts were taken because of [the victim]'s race. Rather, the evidence demonstrates that the incident resulted from [the defendant]'s and [the victim]'s disagreement about where the car was parked. [The victim] and [the other complaining witness] left the shop and later returned, which resulted in the second confrontation. [The victim]'s return to the scene 20 minutes later escalated their confrontation, which continued with both [the victim] and [the defendant] shouting at each other and [the defendant]'s brandishing of the gun. We recognize that while [the defendant]'s use of the " 'N word' [is] offensive, 'repugnant or obnoxious language does not, in itself, demonstrate tha[t] an action was undertaken 'by reason of the victim's race.' " *Chopak*, 2012-Ohio-1537, at ¶ 24, quoting *Kingery*, 2012-Ohio-505, at ¶ 20.

*Wochele*, 2019-Ohio-1122, at ¶ 25.  The court concluded, "the evidence demonstrates that the threats between [the victim] and [the defendant] were prompted by their random, happenstance dispute over where the car was parked.  As a result, there is insufficient evidence to demonstrate that [the defendant] threatened [the victim] with a gun because of his race."  *Id.* at ¶ 29.

{¶ 41} In *Chopak*, tensions had arisen between white and black neighbors over a series of past incidents involving alleged animal abuse, alleged disrespect, and alleged shoulder-bumping while walking. *Chopak*, 2012-Ohio-1537, at ¶ 5-8. In the incident giving rise to the case, the black neighbor began having a verbal argument with the white neighbor and followed the white neighbor to his house where she threatened to "kick" his "ass" and called him a "cracker." *Id.* at 8-10. The white neighbor who, by then, had retreated behind the gate to his property, pulled out a knife, stabbed into the air through the gate, and told her, "I will f—— kill you and slit your throat, you f—— n—." *Id.* at ¶ 11. Although the appellate court affirmed the conviction for menacing, it reversed the defendant's conviction of ethnic intimidation reasoning as follows:

> We find insufficient evidence in this record that [the defendant] threatened [the victim] with a knife because of her race. There is simply no evidence in this record that [the defendant] selected [the victim] as his victim because she is African-American, nor is there any evidence that his menacing acts were taken because of her race. Rather, the evidence demonstrates that [the defendant]'s actions were taken in response to [the victim]'s refusal to back away from a confrontation that she instigated by confronting him in [another neighbor]'s house, and then escalated by following him out of the house and haranguing him as he walked away. It would not be unreasonable for anyone to react in anger to such confrontational conduct. And although [the defendant]'s use of the "N word" was offensive, "repugnant or obnoxious language does not, in itself, demonstrate than an action was undertaken 'by reason of the victim's race.' " *State v. Kingery*, 2d Dist. No. 24063, 2012 Ohio 505, ¶ 20. Here, it is apparent that the threats [the defendant] made were prompted by [the victim]'s conduct and not "by reason of her race.

*Chopak*, 2012-Ohio-1537, at ¶ 24.

{¶ 42} In *Kingery*, a black mail carrier sprayed the defendant's dog with "dog repellant" when (as he went about his appointed rounds) the dog ran toward him barking. *Kingery*, 2012-Ohio-505, at ¶ 2. Seeing her dog thus repelled, the defendant yelled profanities and racial slurs including the n-word, told the mail carrier to go back to Africa, and threatened to "woop his ass." *Id.* at ¶ 3. The court sustained her conviction for menacing but reversed her conviction for ethnic intimidation reasoning:

> [The defendant] cites several ethnic intimidation cases which make the point that the racial motivation constituting such an

offense goes beyond mere words. *See, e.g., In re McDonald*, 11th Dist. Lake No. 2006-L-027, 2007 Ohio 782 (where a package resembling a bomb was delivered to the only African-American family in a neighborhood, as they were in the process of moving in, addressed "to the N******" and from "your friends the K.K.K."); *State v. Grays*, 12th Dist. Butler No. CA2005-07-187, 2006 Ohio 2246 (where a cross was burned in the yard of an African-American woman). In these cases, the defendant exhibited a racial animus directly tied to and as a motivating factor in the underlying offense. No such evidence was presented against [the defendant in this case]. There was no basis to conclude that [the defendant]'s reaction to the spraying of her dog would have been more civilized or less "emotional" if the mail carrier had not been African American. Thus, [the defendant]'s conviction for ethnic intimidation was supported by insufficient evidence.

*Kingery*, 2012-Ohio-505, at ¶ 22.

{¶ 43} In this case, however, the cause of the rift between Fabich and Brown is considerably less clear-cut than in *Wochele*, *Chopak*, and *Kingery*. It is undisputed that Brown and Fabich had, by Brown's own testimony, been neighbors for a long time and had many past interactions (Tr. at 37, 55.) Though Brown confessed he was unable to formulate an appropriate response to whether it was safe to say that he disliked Fabich, it seems undisputed that there was some degree of enmity between the two. (Tr. at 54.) Fabich's testimony (which is not contradicted on this point) makes clear that problems between him and Brown had been ongoing and arose as early as 2004. (Tr. at 188-89, 212.) Fabich's testimony also presents the view that Brown had, during a prior interaction, made clear to Fabich that he was a "Tarzan" and explained the insulting nature of that comment. (Tr. at 201-02, 212.) But why things came to a head on the day that they did or why the two men wound up trading racial insults (with Fabich dealing the vast majority of racial invective), is a matter of inference. Thus, the question is: Is this a case like *Wochele*, *Chopak*, and *Kingery*, where the cause of the confrontation was clear-cut and where the racial invective was not good evidence of a motive? Or did the record permit the jury to infer, given the lack of other clear explanation for the confrontation, that Fabich's disorderly conduct toward Brown was motivated, at least in part, by Brown's race?

{¶ 44} When analyzing the sufficiency of the evidence, we draw all inferences in favor of the City. *Monroe*, 2005-Ohio-2282, at ¶ 47. In that circumstance, we must credit

the assertion that Fabich initiated the interaction and began using racial slurs against Brown without specific provocation. (Tr. at 40, 111.) Moreover, the evidence in the record amply supports that the argument between Brown and Fabich included racially abusive language, and the jury could have inferred racial animus from Fabich's statement, "Let's have some race fun." (City's Ex. 1 at 1:43-1:47.) *See also supra* at ¶ 6. Under the circumstances, viewing the evidence in the light most favorable to the prosecution, the record is sufficient to conclude beyond a reasonable doubt that at least one of Fabich's motives in perpetrating disorderly conduct toward Brown was racist. *Monroe*, 2005-Ohio-2282, at ¶ 47.

{¶ 45} When using a manifest weight analysis and weighing the testimony as if we were the proverbial "thirteenth juror," the picture is more complicated, but the racial motive behind the altercation still finds support. *Thompkins*, 78 Ohio St.3d at 388. Brown stated that he never called Fabich "Tarzan," that he had never used the term before, and testified that he did not hear Fabich reference having been mocked for his whiteness during the video of the incident. (Tr. at 65-71, 83.) Moessner testified in support of this one-sided narrative when he claimed that neither he nor Brown said anything at all in response to Fabich. (Tr. at 111-13, 120-21.) But, during the video, a person off screen can be heard shouting back at Fabich, much of it inaudible. *See, e.g.*, City's Ex. 1 at 1:06-1:09, 1:21-1:28. And at several points during the video, Fabich references an insult apparently offered by Brown: "If you're calling me Tarzan, you're Nigger Brown." *Id.* at 0:56-1:02. "If you're going to make fun of my whiteness, we're going to have it out." *Id.* at 1:19-1:22. "You called me Tarzan. Let's have some race fun." *Id.* at 1:43-1:47. Though the video is somewhat hard to hear, the neighbor (Waderker) who recorded the video, was not at all reticent about confirming that Fabich made the remarks concerning the "Tarzan" insult. (Tr. at 100.) This apparently led Fabich to respond with the torrent of vile racist language, which we have already recounted in detail. *See supra* at ¶ 6. In short, the manifest weight of the evidence is to the effect that these long-time neighbors, Fabich and Brown, became involved in an altercation 'that was motivated, at least in part, by racial animus. Whether that racial animus between the two men was mutual (as it may have been) is of no moment—Brown and his alleged "Tarzan" remark are not on trial. What matters is whether Fabich was motivated by Brown's race when he hurled racist invective at him. Because, unlike in *Wochele*, *Chopak*, and *Kingery*, the record at trial does not offer another clear explanation

for Fabich's motive, we conclude that the jury did not lose its way in concluding from Fabich's statements that Fabich's motive was, at least in part, racial.

{¶ 46} We therefore overrule Fabich's fifth assignment of error.  The n-word is a fighting word in these circumstances.  Fabich employed it against his black neighbor, along with several other insulting racial comments, during a confrontation, the origins for which seem to have no other plausible explanation but racial tension between the two men.  Under these circumstances, Fabich's conviction for disorderly conduct and ethnic intimidation is sufficiently supported and not manifestly against the weight of the evidence.

### D. Sixth Assignment of Error - Whether the Trial Court Denied Fabich the Opportunity to Allocute'

{¶ 47} During sentencing, the trial court did not permit or offer Fabich (or the victim, for that matter) the opportunity to speak prior to imposing sentence.  (June 26, 2019 Sentencing Tr. at 4-6.)  Ohio Rule of Criminal Procedure 32 requires that "[a]t the time of imposing sentence, the court shall * * * address the defendant personally and ask if he or she wishes to make a statement in his or her own behalf or present any information in mitigation of punishment."  Crim.R. 32(A)(1).  "If the court imposes sentence without affording the defendant an opportunity to allocute, then resentencing is required unless the error was invited or harmless."  *State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, ¶ 200, citing *State v. Osie*, 140 Ohio St.3d 131, 2014-Ohio-2966, ¶ 179; *see also State v. Campbell*, 90 Ohio St.3d 320 (2000), paragraph three of the syllabus.

{¶ 48} Here, the trial court proceeded to sentencing without affording anyone, defendant or victim, or even counsel for the parties, any time to make a statement that might have held sway or effect with the trial 'court when imposing sentence.  (June 26, 2019 Sentencing Tr. at 5 (shutting down comments by declining to hear from any witnesses and stating "[t]his Court is confident I have all that I need to enter into sentencing at this time").)  After the trial court pronounced sentence, the victim was permitted to make a statement that amounted to an expression thanks to the court. *Id.* at 9-14.  But neither side had a real opportunity to make an impactful statement to the court in advance of sentence when it might have made a difference.  *Id.* at 5.  Nor does there appear to be a factual basis for finding that this omission by the trial court was invited or harmless.

{¶ 49} In connection with reviewing the sentence, we note, though neither side raises it as an issue, that the trial court never made clear what portions of the total sanction

were attributable to each offense for which Fabich was convicted. (June 26, 2019 Sentencing Tr. at 5-6; June 27, 2019 Jgmt. Entry.) The Supreme Court has held that a sentencing court "must consider each offense individually and impose a separate sentence for each offense." *State v. Saxon*, 109 Ohio St.3d 176, 2006-Ohio-1245, ¶ 9. Failing to follow this requirement under the circumstances is an obvious error because it directly alters the sentence and therefore affects the outcome of the proceeding. *State v. Rogers*, 143 Ohio St.3d 385, 2015-Ohio-2459, ¶ 22; *State v. Betts*, 10th Dist. No. 19AP-226, 2020-Ohio-4891, ¶ 21.

{¶ 50} We sustain Fabich's sixth assignment of error and remand for resentencing.

### E. Seventh Assignment of Error - Whether the Trial Court Erred in Restricting Fabich's Animal Possession as a Condition of Probation

{¶ 51} During sentencing, the trial court also imposed a prohibition on Fabich's ability to own animals or to reside where animals are present for reasons that are not clearly explained by the appellate record in this case. (June 26, 2019 Sentencing Tr. at 6.) Nothing about Fabich's interaction with Brown (that is the sole content of the charges at issue in this appeal) involved animals. Though there are some hints in the record that other charges and matters may have been at issue in other cases, the appellate record before us does not clearly indicate what they are and provides no basis for any such restriction being levied in this case. (Mar. 11, 2019 Bond Violation Hearing Tr. at 13-14, 24-25.) However, because resentencing will already occur as a result of our having sustained Fabich's sixth assignment of error, this potential error has been rendered moot.

## IV. CONCLUSION

{¶ 52} We find that the disorderly conduct ordinance is not unconstitutional, as limited by Supreme Court of Ohio precedent to fighting words. We moreover find that the n-word is a "fighting word" when uttered under the circumstances in this case, and we consequently affirm Fabich's conviction for disorderly conduct. We further find, in accordance with precedent from this Court, the United States Supreme Court, and the Supreme Court of Ohio, that the City of Columbus's ethnic intimidation ordinance is facially constitutional due to its plainly legitimate sweep. It is also constitutional as applied to a predicate offense of disorderly conduct because it does not punish the content of fighting words but instead punishes the biased motive or reason for the utterance without regard to the content of the words uttered.

{¶ 53} The evidence in this case showed that Fabich used racially charged fighting words in combination with other racially derogatory statements. Though the content of these words is not (and cannot constitutionally be) the target of the ethnic intimidation ordinance, the lack of other explanation for the conflict between Fabich and Brown permits those words to serve as evidence of Fabich's motivation for the conflict and the use of fighting words. We therefore affirm Fabich's convictions for disorderly conduct and ethnic intimidation.

{¶ 54} We find that the trial court did not err in correcting its instruction on causation in response to a jury question.

{¶ 55} We do, however, conclude that the trial court erred by failing to give Fabich the opportunity to allocute and by failing to sentence on each offense. In light of that, we find Fabich's remaining allegation regarding the sanction that he not own or reside with animals to be moot.

{¶ 56} We overrule Fabich's first, second, third, fourth, and fifth assignments of error. We sustain his sixth assignment of error. We find his seventh assignment of error to be moot. We reverse in part, affirm in part, and remand to the Franklin County Municipal Court for resentencing.

*Judgment reversed in part,*
*affirmed in part, and*
*remanded for resentencing.*

DORRIAN and BEATTY BLUNT, JJ., concur.