[Cite as *State v. Wochele*, 2019-Ohio-1122.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 106769**

**STATE OF OHIO**

PLAINTIFF-APPELLEE

vs.

**ERIC L. WOCHELE**

DEFENDANT-APPELLANT

**JUDGMENT:**
MODIFIED AND REMANDED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-17-623093-A

**BEFORE:** Per Curiam

**RELEASED AND JOURNALIZED:** March 28, 2019

**ATTORNEY FOR APPELLANT**

Russell S. Bensing
1370 Ontario Street
1350 Standard Building
Cleveland, Ohio 44135

**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor
Jeffrey M. Maver
Assistant County Prosecutor
The Justice Center - 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

PER CURIAM:

**{¶1}** Defendant-appellant, Eric Wochele ("Wochele"), appeals his ethnic intimidation conviction. For the reasons set forth below, we modify and remand for resentencing.

**{¶2}** In November 2017, Wochele and codefendant, Scott Walterschied ("Walterschied"), were charged with two counts of ethnic intimidation, with each count carrying one- and three-year firearm specifications.[1] The indictment lists aggravated menacing as the underlying offense. Prior to trial, Walterschied entered into a plea agreement with the state of Ohio ("state"). As part of the plea agreement, Walterschied pled guilty to one count of ethnic intimidation. The state nolled the one- and three-year firearm specifications and the remaining count. Wochele proceeded to a bench trial where the following evidence was adduced.

[1]As of the date of this opinion, Walterschied has not filed an appeal.

{¶3} On April 29, 2017, Markus Lurns ("Lurns") and his girlfriend, Katrina Woodley ("Woodley"), planned to drop off Woodley's car at a paint shop near East 66th and Bessemer in Cleveland. They followed each other to the shop in their respective vehicles. Lurns drove a large truck and Woodley drove a sedan. Lurns testified that as he and Woodley approached the shop, he noticed a car parked across the driveway of the parking lot, making it difficult for him to maneuver his truck through the driveway. The car was in front of Wochele's business — an auto body shop, which shared the driveway with the paint shop. The owner of the paint shop was not present when Woodley and Lurns arrived, so they decided to leave. Woodley was able to exit the drive and park her car on the street.

{¶4} Woodley and Lurns are African-American. Lurns testified that he asked Wochele, who is Caucasian, if he could move the car so that he could back his truck out of the driveway. Lurns testified that Wochele refused and yelled "[n]ext time park on the mother f — street." (Tr. 44.) Lurns replied, "I'm a paying customer. I park wherever I want[.]" *Id.* At no point during this exchange was a racial slur used. Additionally, Lurns testified that he did not feel threatened after this encounter. (Tr. 59.)

{¶5} With Wochele's car parked as it was, Lurns managed to exit the drive and returned approximately 20 minutes later with Woodley. When they returned, they noticed that the car was now parked up against the fence blocking the entire entrance.

{¶6} Consequently, Lurns parked his truck on the street, and he and Woodley walked up to the paint shop. As they approached the shop, Lurns testified that he heard Wochele say, "[t]hat's why that n — parked on the street and that n — this." (Tr. 46.) Lurns replied, "we left and we was gone for 20 minutes, 30 minutes, now we are back and you still starting trouble with

me." *Id.* Woodley told Lurns that "it's not worth it" to engage with Wochele and told him to keep walking to the paint shop.

{¶7} As Woodley and Lurns continued toward the shop, Wochele disappeared. Shortly thereafter, Wochele reappeared with Walterschied, who brandished a firearm in each hand. Walterschied then handed one of the guns to Wochele as they ran towards Lurns and Woodley. Walterschied and Wochele both had their guns pointed at Lurns and Woodley. Lurns testified that while Wochele was pointing his gun at him, he continued to say "[a] lot of n — words" and that he could carry the pistol because he has a CCW license. (Tr. 48.) Both Lurns and Woodley testified that Wochele's actions scared them. Oddly, Woodley further testified that she was never actually threatened by Wochele. (Tr. 79-80.)

{¶8} Lurns then called a family member who advised him to call 911. Lurns's family member is a police officer. As a result, Lurns called 911. Lurns was on the phone with the 911 operator for approximately nine and a-half minutes. While on phone, Lurns never mentioned that Wochele called him the "N word." Nor did he say that he was upset that Wochele used racial slurs. He did tell the operator that he and Wochele got into an argument and were calling each other "b —." (Exhibit no. 1.)

{¶9} Cleveland police officers arrived on the scene within approximately ten minutes after the 911 call. The investigation by the police was captured on bodycam video, which was played at trial. The bodycam video depicts Lurns and Woodley calmly discussing the incident with the officers. (Ex. 4). During their discussion, neither Lurns nor Woodley used or repeated the "N word" when describing what Wochele said to them. Lurns and the investigating officer both acknowledged this on cross-examination. Lurns did tell the officers that he and Wochele were calling each other "b —." Woodley also acknowledged on cross-examination that "[n]o

one ever said they were pulling a gun out because you're African American." (Tr. 80.) One of the investigating officers stated that this was not the first time he has been to the mechanic shop with a call about Walterschied waiving a gun in the air. The investigating officer stated that he was going to do an "agg menacing" report. The detective assigned to the case testified that when he received the report a few days later, it "was already titled ethnic intimidation." (Tr. 103.)

{¶10} Wochele testified in his own defense. He owns a mechanic shop next to the paint shop Lurns and Woodley were patronizing. Wochele testified that 99% of his clientele is African-American. On the date of the incident, he pushed a car he was working on outside so he could diagnose it. He observed a vehicle out back. When he walked outside, Lurns asked Wochele if he could move the car so he could exit the property. Wochele replied, "[n]o, the car isn't moveable right now. I can't get it moved." He told Lurns, "[i]f you can't back out of here you shouldn't have pulled in." Lurns replied, "I'm a paying customer. I park wherever I want[.]" (Tr. 44.)

{¶11} Lurns was able to exit the driveway without Wochele moving the car. After Lurns left, Wochele moved the car another two to three feet so another car could not enter the drive. A short while later, Lurns returned. Wochele testified that Lurns put his hand behind his back between his coat and said, "I'll blow your head off," while using an expletive. Wochele believed that Lurns had a firearm. As a result, he walked toward Lurns with his fists up and replied, "I'm unarmed but if you want to do this let's go." At that point, the two of them exchanged words. Wochele called Lurns a "b —" and said "[y]ou want to do this, we could do this, mother f —." He testified Lurns said, "[y]ou cracker, mother f —." (Tr. 124.)

{¶12} Wochele testified that Walterschied then came outside with a gun. (Tr. 125.) Wochele told Walterschied that the gun was not necessary. He took the gun from Walterschied, put it in his pocket, and walked away. He said to Walterschield "[g]ive me the gun. At least I have a license. I could have a gun. I'm a licensed concealed carrier." *Id.* Wochele admitted on cross-examination that he never actually saw Lurns with a gun at any time.

{¶13} Wochele further testified that he did not use any racial slurs at any time during both interactions. He testified that the threats he made to Lurns were retorts to Lurns's threats.

{¶14} At the conclusion of trial, the court found Wochele guilty of one count of ethnic intimidation (Count 1), as well as the one- and three-year firearm specifications. The trial court granted Wochele's Crim.R. 29 motion in part, and dismissed Count 2, which named Woodley as the victim. The trial court sentenced Wochele to 6 months on Count 1 and 36 months on the three-year firearm specification to be served prior to and consecutive to Count 1 for a total of 42 months in prison.

{¶15} Wochele now appeals, raising the following single assignment of error for review.

<u>Assignment of Error One</u>

The trial court erred in entering a judgment of conviction of ethnic intimidation, in the absence of any evidence that [Wochele] committed the crime of aggravating menacing "by reason of" the victim's race.

{¶16} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. No. 92266, 2009-Ohio-3598, ¶ 12. An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. The

relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541.

{¶17} Under R.C. 2903.21(A), "no person shall knowingly cause another to believe that the offender will cause serious physical harm to the person or property of the other person[.]" Aggravated menacing does not require that the offender be able to carry out his threat or even believe himself capable of carrying it out; it is sufficient if the offender knowingly causes the victim to believe the offender will carry his threat into execution. *State v. Walker*, 8th Dist. Cuyahoga No. 88694, 2007-Ohio-4047, ¶ 14, citing *State v. Charlton*, 11th Dist. Trumbull No. 2006-T-0079, 2007-Ohio-2051, ¶ 12. "The gist of the offense is the victim's reasonable belief that serious physical harm is about to befall him." *Id.*

{¶18} With regard to ethnic intimidation, this court has stated that "the crime of ethnic intimidation occurs when a person commits a specified predicate offense by reason of race, color, religion, or national origin." *State v. Wisniewski*, 8th Dist. Cuyahoga No. 77152, 2000 Ohio App. LEXIS 5220, *13 (Nov. 9. 2000). The ethnic intimidation statute is set forth in R.C. 2927.12(A) and provides that "[n]o person shall violate [R.C.] 2903.21 * * * by reason of the race, color, religion, or national origin of another person or group of persons."

{¶19} Wochele argues that there is insufficient evidence to convict him of ethnic intimidation because racial slurs are not enough to establish a violation of the ethnic intimidation statute. He contends that his actions were the result of a dispute over a parking spot, not because of Lurns's race. In support of his argument, Wochele relies on *State v. Chopak*, 8th Dist. Cuyahoga No. 96947, 2012-Ohio-1537, *discretionary appeal not allowed*, *09/05/2012 Case*

*Announcements*, and *State v. Kingery*, 2d Dist. Montgomery No. 24063, 2012-Ohio-505. We find these cases persuasive.

**{¶20}** In *Chopak*, a dispute arose between two neighbors, Kimyatta Fuller ("Fuller"), an African-American, and Bowen Chopak, a Caucasian. There were several incidents that took place prior to the day in question that contributed to escalating tension between Fuller and Chopak. On the day of the incident, Fuller went to a neighbor's house, knowing that Chopak was there, to question him about an incident with her son. *Id.* at ¶ 9. Fuller testified that:

> Chopak ignored her at first, and then told her that he did not want to talk to her. According to Fuller, Chopak became upset when she continued to question him, threw his plate of food at the wall, and used obscenities at her. He then got up from the table and walked out the back door of [the neighbor's] house toward his house. Fuller admitted that instead of letting Chopak leave, she followed him out the back door and continued to question him about the incident. According to Chopak, Fuller cursed and harassed him as he walked away. Chopak testified that as he was walking toward his house, Fuller slapped him on the back of his head so hard that it knocked off his baseball cap and that as he bent down to pick it up, she told him, "I'll kick your ass myself" and called him a "racist cracker."__
>
> Chopak walked through the gate of the chain-link fence onto his lot and closed the gate. Fuller remained on the other side of the fence but stood by the gate and continued to verbally harangue Chopak. According to Fuller, [Chopak's cousin's girlfriend] then came out of the back house and began using vulgar language and hurling racial slurs at her. Chopak then pulled a small knife out of his pocket, stabbed it several times through the gate, and told Fuller, "I will f—— kill you and slit your throat, you f—— n—."
>
> Chopak testified that he pulled the knife because he felt threatened when he saw four African-American males come from around the front of [the neighbor's] house and walk into the backyard as he and Fuller were arguing at the fence. Fuller, along with [her son and daughter], who had heard the commotion and come down to see what was going on, denied that there were any other males in the yard during the confrontation.

*Id.* at ¶ 10-12.

**{¶21}** On appeal, this court affirmed Chopak's conviction for aggravated menacing, but vacated his conviction for ethnic intimidation. *Id.* at ¶ 32. In finding insufficient evidence to convict Chopak of ethnic intimidation, this court stated:

> There is simply no evidence in this record that Chopak selected Fuller as his victim because she is African-American, nor is there any evidence that his menacing acts were taken because of her race. Rather, the evidence demonstrates that Chopak's actions were taken in response to Fuller's refusal to back away from a confrontation that she instigated by confronting him in [the neighbor's] house, and then escalated by following him out of the house and haranguing him as he walked away. It would not be unreasonable for anyone to react in anger to such confrontational conduct. And although Chopak's use of the "N word" was offensive, "repugnant or obnoxious language does not, in itself, demonstrate tha[t] an action was undertaken 'by reason of the victim's race.'" [*Kingery*], 2d Dist. No. 24063, 2012-Ohio-505, ¶ 20. Here, it is apparent that the threats Chopak made were prompted by Fuller's conduct and not "by reason of" her race.

*Id.* at ¶ 24.

**{¶22}** *Kingery* involved a confrontation between Christina Kingery, a Caucasian, and a Laderek Brown ("Brown"), an African-American. Brown, a mailman, was delivering mail to the Kingerys. On the day in question, Brown sprayed the Kingery's dog with "dog repellant" as he was approaching the Kingery's mailbox, which was located on the front of the house. *Id.* at ¶ 2. According to Brown, the dog ran towards him, was barking and very aggressive, and was not on a leash. He had been bitten by dogs before and was afraid that he was going to be attacked by the Kingerys' dog. *Id.* at ¶ 13. Brown further testified that:

> Kingery became very upset and belligerent after he sprayed the dog with repellant. She called him a "n*****," told him to go back to Africa, told him to go back to the west side of the city, and said "that's why I called you a n***** because you do things like that (spraying the dog)." Brown testified that Kingery also threatened "wooping his ass." Brown said that he felt threatened by these comments and by Kingery's screaming and shouting, and that he retreated from the house, believing that Kingery might cause him physical harm.

*Id.* at ¶14.

**{¶23}** In reversing Kingery's conviction for ethnic intimidation, the Second District Court of Appeals noted that ethnic intimidation statutes proscribe conduct (rather than speech) that is not protected under the First Amendment. *Id.* at ¶ 21, citing *Dayton v. Smith*, 68 Ohio Misc.2d 20, 646 N.E.2d 917 (Dayton Mun. 1994), citing *Wisconsin v. Mitchell*, 508 U.S. 476, 487, 113 S.Ct. 2194, 124 L.Ed.2d 436 (1993); *In re M.J.M.*, 2004 PA Super 360, 858 A.2d 1259 (Pa.Super. 2004). "Thus, Kingery's words alone could not have established the offense of ethnic intimidation." *Id.* Rather, the defendant must exhibit a racial animus directly tied to and as a motivating factor in the underlying offense to sustain the conviction. *Id.* at ¶ 22. The court concluded that no such evidence was presented against Kingery. "There was no basis to conclude that Kingery's reaction to the spraying of her dog would have been more civilized or less 'emotional' if the mail carrier had not been African American." *Id.*

**{¶24}** Here, Lurns testified that while Wochele was pointing his gun at him, Wochele said "[a] lot of n — words" and that he could carry the pistol because he has a CCW license. However, in the nine and a-half minute 911 call and the eight-minute bodycam video captured immediately following the incident, Lurns never stated that Wochele used the "N word." In fact, the bodycam video depicts Lurns speaking calmly with the officers when describing the incident. Moreover, when testifying about calling his family member prior to calling 911, Lurns never stated he told his family member that Wochele used the "N word."

**{¶25}** As in *Chopak* and *Kingery*, in the instant case, there is no evidence that Wochele sought out Lurns because of his race, nor is there any evidence that Wochele's menacing acts were taken because of Lurns's race. Rather, the evidence demonstrates that the incident resulted from Wochele's and Lurns's disagreement about where the car was parked. Lurns and Woodley left the shop and later returned, which resulted in the second confrontation. Lurns's return to the

scene 20 minutes later escalated their confrontation, which continued with both Lurns and Wochele shouting at each other and Wochele's brandishing of the gun. We recognize that while Wochele's use of the "'N word' [is] offensive, 'repugnant or obnoxious language does not, in itself, demonstrate tha[t] an action was undertaken 'by reason of the victim's race.'" *Chopak*, 2012-Ohio-1537, at ¶ 24, quoting *Kingery*, 2012-Ohio-505, at ¶ 20.

**{¶26}** We recognize this court's decision in *State v. Sura*, 8th Dist. Cuyahoga No. 85309, 2005-Ohio-3838. In *Sura*, we found that Sura's conviction for ethnic intimidation was supported by sufficient evidence and not against the manifest weight of the evidence. The evidence presented at trial revealed that shortly after an African-American family moved into an all-white neighborhood, Sura poured gas and weed killer on the family's lawn, threatened to throw a brick at two members of the family, and made somewhere between 10 and 50 derogatory racial remarks to the family over a period of less than three months. *Id.* at ¶ 22.

**{¶27}** *Sura* can be easily distinguished. The defendant in *Sura* was proactive. Sura intentionally and specifically sought out the victims based on their race and went to their home with the purpose to harm them. This proactive selection by the defendant in *Sura* is clearly distinguishable from the random, happenstance interaction between Lurns and Wochele. Here, Wochele did not intentionally and specifically seek out Lurns because of his race. Rather, Wochele and Lurns began to argue after Lurns did not agree with where Wochele parked the car he was repairing at the time Lurns happened to drop off Woodley's car.

**{¶28}** We are mindful that a hate crime is one in which the victim was selected based on some immutable characteristic — in this case, race. A hate crime, as defined by New York state law, is committed when the person against whom the offense is committed is intentionally selected "because of a belief or perception regarding the race, color, national origin, ancestry,

gender, religion, religious practice, age, disability, or sexual orientation of a person, regardless of whether the belief or perception is correct." NY CLS Penal § 485.05(1)(a). Ohio's hate crime statute focuses on crimes committed with a bias motivated by race, religion, or national origin, and falls into the category of "ethnic intimidation" under R.C. 2927.12. In other words, ethnic intimidation results when a crime is committed on the basis of the victim's race. The evidence in the instant case does not support this conclusion.

{¶29} Rather, the evidence demonstrates that the threats between Lurns and Wochele were prompted by their random, happenstance dispute over where the car was parked. As a result, there is insufficient evidence to demonstrate that Wochele threatened Lurns with a gun because of his race. There is sufficient evidence in the record, however, that Wochele knowingly caused Lurns to believe that he would cause serious physical harm to him. Therefore, Wochele's conviction for ethnic intimidation is modified to aggravated menacing and remanded for resentencing.

{¶30} Accordingly, the sole assignment of error is sustained in part and overruled in part.

{¶31} Judgment is modified and remanded. The defendant is ordered discharged.

It is ordered that appellee and appellant share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been modified in part, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, ADMINISTRATIVE JUDGE

EILEEN T. GALLAGHER, JUDGE

KATHLEEN ANN KEOUGH, JUDGE