[Cite as *Fairview Park v. Werling*, 2024-Ohio-5323.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

CITY OF FAIRVIEW PARK,      :

     Plaintiff-Appellee,     :

                                    Nos. 113684, 113686, and 113687

     v.                             :

AMBER L. WERLING,         :

     Defendant-Appellant.    :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** November 7, 2024

---

Criminal Appeal from the Rocky River Municipal Court
Case Nos. 23 CRB 0339, 23 CRB 0937, and 23 CRB 0938

---

### *Appearances:*

John T. Castele, City of Fairview Park Assistant Law Director/Prosecutor, *for appellee.*

Susan J. Moran, *for appellant.*

SEAN C. GALLAGHER, J.:

{¶ 1} In this consolidated appeal, appellant Amber L. Werling appeals her convictions in three underlying cases. Upon review, we affirm both of her convictions for menacing and her conviction for ethnic intimidation.

{¶ 2} Werling was charged in three separate cases for offenses arising from her conduct toward employees of a Famous Footwear store. Werling was charged with menacing, against victim L.M., in Rocky River M.C. No. 23 CRB 0339 and with ethnic intimidation, also against victim L.M., in Rocky River M.C. No. 23 CRB 0938 for an incident that occurred on February 19, 2023. Werling was charged with menacing, against separate victim A.S., in Rocky River M.C. No. 23 CRB 0937 for an incident that occurred on April 2, 2023. Following a bench trial, Werling was found guilty of all three offenses. In each case, Werling was sentenced to a suspended jail term, placed on three years of probation, and ordered to pay a $100 fine. Werling timely filed this appeal.

{¶ 3} The transcript reflects that on December 22, 2020, Werling went to the Famous Footwear store at Westgate Mall in Fairview Park, Ohio, to return a pair of shoes. L.M., D.C., and another employee were working at the time. A dispute arose regarding the return, and Werling began to record the encounter on her cell phone. The incident ended with Werling being told that she had to leave the store and that she was not allowed to come back into the store. After leaving, Werling, who is a white woman, called the store several times and reportedly used derogatory language and used the "N" word directed at L.M., who is an African-American woman. Werling was told to stop calling or the police would be called.

{¶ 4} On February 19, 2023, L.M. and A.S. were working at the same Famous Footwear store in Fairview Park when Werling came into the store with her daughter to shop for shoes. When Werling and her daughter approached the

register, L.M. recognized Werling and told her that she was not allowed to be in the store. L.M. testified that Werling then started yelling at L.M., slammed the door, yelled, "Dave, [t]his n***** b**** is trying to beat my a**", and repeatedly called L.M. a "n***** b****." L.M.'s son and her son's father ("Dave") were outside in the car. A.S., who was aware of the 2020 incident, testified that Werling was shopping in the store and after she was told by L.M. that she was not allowed in the store, Werling started "screaming and yelling" and kept calling L.M. a "fat n***** b****." According to Werling and her daughter, after they entered the store, L.M. was in Werling's face and threatening to beat her up and spit in her face and, at that point, Werling yelled out the door to Dave, got in the car, and the police were called. Werling provided testimony to explain her use of the "N" word and asserted it was in response to L.M.'s accusations and was not intended as a racial slur but as a derogatory comment to describe her as ignorant for what L.M. did to Werling in front of her daughter. Dave also testified.

{¶ 5} A.S. recorded a portion of the incident on her phone, which was played during trial. A.S. testified that Werling was "screaming the N word over and over" and was calling L.M. a "n***** b****" for at least 30 seconds before A.S. began recording the incident. The video showed that as Werling was leaving the store, she yelled out the statement testified to by L.M. and told Dave to "call the police." L.M. responded to go ahead and call the police because Werling was "trespassing." After slamming the door, Werling walked off screen as she continued to yell the racial slur. The police were then called by both sides to the incident.

{¶ 6} A responding officer testified that two calls came in to the police. The officer described Werling's demeanor at the scene as "aggressive, argumentative, not calm," and "very animated." No arrests were made at the time. Another officer, who prepared a report, indicated that Werling stated she called L.M. the "N" word because of how she was acting and not because Werling is racist. L.M. did not report her feelings in her initial statement. An officer returned to the store a few days later and spoke with L.M., who told the officer she was fearful. L.M. testified that she was fearful the day of the incident and stated, "[T]he fact that she went to her car to call her boyfriend to tell him I'm trying to do something to her, of course I'm fearful. I don't know what she's capable of."

{¶ 7} On April 2, 2023, Werling messaged A.S. on Facebook. A.S. testified that Werling had to have searched for her name in order to send the message and that when she read the message, she felt threatened. A.S. indicated that Werling was clearly still mad about what happened at the store. In the message, Werling referred to the incident at the store, repeatedly referred to L.M. as an "orca b****" and emphasized "ORCA," used profanity, and proceeded to state the following:

> Since that orca knows I have black family! She also knows what we are about lol!
>
> Y'all don't want smoke I promise you that!!!! For your sakes, I hope I never see y'all out, in Lorain, in [Fairview Park], anywhere! Y'all lucky there was a door to my left because that whole situation could have turned out differently if there wasn't!!"
>
> Y'all lucky to still have jobs!

**{¶ 8}** A.S. testified that the message made her feel unsafe, that she took it as a threat, that it included the city where A.S. lives, that she did not know what Werling or her family were capable of doing, and that her first instinct was to call the police. A.S. told L.M. and her work team through a group chat about the Facebook messages.

**{¶ 9}** Other testimony and evidence were presented that this court has thoroughly reviewed. On appeal, Werling raises three assignments of error for review.

**{¶ 10}** Under her first assignment of error, Werling claims the trial court erred by denying her Crim.R. 29 motion for acquittal on all charges. "'A motion for acquittal under Crim.R. 29(A) is governed by the same standard as the one for determining whether a verdict is supported by sufficient evidence.'" *State v. Spaulding*, 2016-Ohio-8126, ¶ 164, quoting *State v. Tenace*, 2006-Ohio-2417, ¶ 37. "'The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *Id.*, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. When evaluating the sufficiency of the evidence, a reviewing court considers "whether the evidence, 'if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt.'" *State v. Pountney*, 2018-Ohio-22, ¶ 19, quoting *Jenks* at paragraph two of the syllabus.

{¶ 11} In this matter, Werling was found guilty of menacing, a misdemeanor of the fourth degree in violation of R.C. 2903.22(A), and ethnic intimidation, a misdemeanor of the third degree in violation of R.C. 2927.12(A), as related to the February 19, 2023 incident at the Famous Footwear store. L.M. was the alleged victim of those charges. Additionally, Werling was found guilty of menacing, a misdemeanor of the fourth degree in violation of R.C. 2903.22(A), as related to the Facebook message that was sent to A.S. on April 2, 2023. A.S. was the alleged victim of that charge.

{¶ 12} R.C. 2903.22, the menacing statute, provides in relevant part that "[n]o person shall knowingly cause another to believe that the offender will cause physical harm to the person or property of the other person . . . ." R.C. 2903.22(A)(1). "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). "Physical harm" is "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).

{¶ 13} R.C. 2927.12, the ethnic-intimidation statute, provides in relevant part that "[n]o person shall violate section . . . 2903.22 . . . of the Revised Code by reason of the race, color, religion, or national origin of another person or group of persons." R.C. 2927.12(A). As this court previously has stated, "'[T]he crime of ethnic intimidation occurs when a person commits a specified predicate offense *by reason of* race, color, religion, or national origin.'" (Emphasis added.) *State v.*

*Wochele*, 2019-Ohio-1122, ¶ 18 (8th Dist.), quoting *State v. Wisniewski*, 2000 Ohio App. LEXIS 5220, *13 (8th Dist. Nov. 9, 2000).

{¶ 14} With respect to the offenses relating to the incident on February 19, 2023, Werling does not dispute that she used a highly repugnant racial word. She argues that there was never any threat made to any alleged victim and there was no objective conduct that would lead a person to believe Werling was going to cause physical harm. She further argues that her use of the "N" word was not coupled with any threat of physical harm, nor were her actions taken because of L.M.'s race.

{¶ 15} "To prove the elements of menacing, the prosecution must show that the victim subjectively believed that there was a possibility of physical harm." *State v. Harvey*, 2023-Ohio-4454, ¶ 29 (6th Dist.), citing *State v. McConnaughey*, 2021-Ohio-3320, ¶ 41 (1st Dist.). Menacing can be implied by an offender's actions without a verbal threat provided the circumstances demonstrate that the victim genuinely believes that he or she is facing physical harm to person or property. *Id.*, citing *State v. Whitehead*, 2019-Ohio-5141, ¶ 24 (2d Dist.). As this court has stated, "The gist of the offense is the victim's reasonable belief that . . . physical harm was about to befall her." *State v. Walker*, 2007-Ohio-4047, ¶ 14 (8th Dist.), citing *State v. Charlton*, 2007-Ohio-2051, ¶ 13 (11th Dist.). A victim need not articulate a precise fear; rather, it is sufficient for the State to establish the victim's general fear for her safety. *Whitehead* at ¶ 24, citing *State v. Howard*, 2010-Ohio-5158, ¶ 14 (2d Dist.).

{¶ 16} The evidence herein shows that after being told on February 19, 2023, that she was not allowed to be in the Famous Footwear store, Werling began

screaming and yelling, repeatedly called L.M. a "n***** b****," yelled out to Dave and was accusing L.M. of having threatened her and telling Dave to call the police, slammed the door, and continued yelling a racial slur directed at L.M.  In the video, L.M. states to go ahead and "call the police" because Werling was "trespassing." Once the door to the store was closed and as Werling was continuing to yell, L.M. told A.S. to call the police and they locked the door.  L.M. testified that she was fearful that day and that she did not know what Werling was capable of.  Although L.M. did not initially report her feelings to police, she did indicate she was fearful when an officer followed up with her a few days later.  The responding officer testified to Werling's demeanor as being aggressive and "very animated."  When viewing this and the other testimony and evidence presented in a light most favorable to the prosecution, we find there was sufficient evidence to establish the essential elements of menacing beyond a reasonable doubt as to this offense.

{¶ 17} We also find sufficient evidence was presented to support Werling's conviction for ethnic intimidation.  Initially, we recognize that the menacing offense that occurred on February 19, 2023, is the predicate offense for the ethnic-intimidation charge.  The city did not identify L.M. as a victim of an offense stemming from the April 2, 2023 Facebook incident.  Nonetheless, as argued by the city, the events of February 19, 2023, cannot be analyzed in a vacuum and, when considering the totality of all three incidents involving Werling and L.M., Werling's racial animus as a motivating factor in the underlying offense is shown.

{¶ 18} Ethnic-intimidation laws are not aimed at regulating speech, but instead proscribe conduct that is not protected under the First Amendment. *Wochele*, 2019-Ohio-1122 at ¶ 23, citing *State v. Kingery*, 2012-Ohio-505 ¶ 21 (2d Dist.); *see also Wisconsin v. Mitchell*, 508 U.S. 476, 487 (1993). Thus, words alone generally are not enough to establish the offense of ethnic intimidation. *See Kingery* at ¶ 20-22 (finding "no basis to conclude that [the defendant's] reaction to the spraying of her dog would have been more civilized or less 'emotional' if the mail carrier had not been African American"); *see also Wochele* at ¶ 25 (finding no evidence menacing acts were taken because of race with respect to an incident that arose from a disagreement about where a car was parked); *State v. Chopak*, 2012-Ohio-1537, ¶ 24 (8th Dist.) (finding no evidence menacing acts were taken because of race when defendant's actions were in response to victim refusing to back away from confrontation she instigated). As recognized in *Wochele*, although use of the "N word" is offensive, such repugnant or obnoxious language does not, "in itself," demonstrate that the menacing act was undertaken by reason of the victim's race. *Id.* at ¶ 25, citing *Chopak* at ¶ 24.

{¶ 19} "To put it more plainly, becoming infuriated with someone for a non-racial reason and, in the course of that angry altercation, hurling a slur does not suffice to transform disorderly conduct into ethnic intimidation." *Columbus v. Fabich*, 2020-Ohio-7011, ¶ 39 (10th Dist.), citing *Wochele* at ¶ 25; *Chopak* at ¶ 24; *Kingery* at ¶ 20. Rather, it must be shown that the defendant exhibited "a racial animus directly tied to and as a motivating factor in the underlying offense to sustain

the conviction." *See Wochele* at ¶ 23, citing *Kingery* at ¶ 22. Also, the First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin* at 489.

{¶ 20} In *Fabich*, the Tenth District recognized that "it is not enough that someone who becomes involved in an altercation utters racial slurs in the course of the altercation; rather, the victim must be targeted 'by reason' of their race . . . ." *Id.* at ¶ 39. The court found in that case that there was sufficient evidence to demonstrate that the motive underlying the disorderly conduct was, at least in part, racial when there was evidence of ongoing tensions between the two neighbors that included a prior interaction in which one neighbor called the other a "Tarzan," a lack of a clear-cut explanation for the confrontation at hand, and the defendant responded by presumably initiating the interaction and using a torrent of racially abusive language. *Id.* at ¶ 44-45. Under the totality of those circumstances, the court found the record permitted the jury to infer a racial motivation. *Id.* at ¶ 43-44.

{¶ 21} Though the circumstances of this case are somewhat different from *Fabich*, this also is not a case in which words alone were used to establish the offense of ethnic intimidation. Here, the record demonstrates that there were three related instances involving the employees of the Famous Footwear store in which Werling brought race into the equation and directed racially abusive language at L.M. Following the December 22, 2020 disagreement over the shoe return, Werling called the store multiple times and made a racial slur directed at L.M. Then, on February 19, 2023, after Werling returned to the store and was reminded that she

was not permitted in the store, Werling began yelling a racial slur at L.M. and she repeated yelling the slur multiple times as she engaged in the menacing conduct against L.M.  Following this incident, in the Facebook messaging sent to A.S. on April 2, 2023, Werling continued to inject racially abusive language directed at L.M., while referencing the February incident at the store.  In the message, Werling states in part:

> You and the giant orca working together as "managers" . . . both at the front plotting what that orca b**** was gonna say to me.
>
> You then let the Giant f****** orca get in my face and threaten me in front of my daughter . . . !  . . . Bet your a** didn't think I was gonna stand up to that giant f***** orca did you?!
>
> . . .
>
> Since that orca knows I have black family!  She also knows what we are about lol!

**{¶ 22}** Viewing the evidence in a light most favorable to the prosecution, we find it could be reasonably inferred from Werling's actions and ongoing behavior, together with her repeated use of racially abusive language directed at L.M., that she committed the February 19, 2023 menacing offense against L.M., at least in part, by reason of race, color, religion, or national origin.

**{¶ 23}** Last, as to the offense of menacing that arose from the Facebook message that was sent to A.S. on April 2, 2023, Werling argues that the message did not threaten A.S. but was an overt attempt to shame A.S. for what Werling believed to be an injustice.  We are not persuaded by her argument.  The record reflects that the Facebook message was sent a month and a half after the February 19, 2023

incident at the store. Werling went out of her way to look up A.S., and it was apparent from the message that Werling was still angry about what happened at the store and was upset with A.S. for "allowing that to happen" and for recording "once I BUCK up!" After alluding to what her family is "all about," Werling stated "Y'all don't want smoke I promise you that!!!!" She specifically referenced where A.S. lives and works, stating, "For your sakes, I hope I never see y'all out, in Lorain, in [Fairview Park], anywhere! Y'all lucky there was a door to my left because that whole situation could have turned out differently if there wasn't." A.S. testified that her first instinct was to call the police, that she took the message as Werling threatening A.S., and that she felt unsafe. Viewing the testimony and evidence presented in a light most favorable to the prosecution, we find there was sufficient evidence to establish the essential elements of menacing beyond a reasonable doubt as to this offense.

{¶ 24} The first assignment of error is overruled.

{¶ 25} Under her second assignment of error, Werling claims her convictions are against the manifest weight of the evidence. When evaluating a claim that a verdict is against the manifest weight of the evidence, "we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial." *State v. Wilks*, 2018-Ohio-1562, ¶ 168, citing *State v. Thompkins*, 78 Ohio St.3d 380,

387 (1997). Reversing a conviction based upon the weight of the evidence should occur "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

{¶ 26} Werling argues that in addition to the arguments made under her sufficiency challenge, when the testimony offered by the defense in this matter is considered, the full picture of what actually occurred is evident and her convictions should be reversed as against the manifest weight of the evidence. We do not agree. After reviewing the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of the witnesses, we do not find the trial court clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed. The second assignment of error is overruled as to the menacing convictions.

{¶ 27} Under her third assignment of error, Werling claims that the trial court erred in failing to dismiss the charges pursuant to Crim.R. 29 because of a lack of venue. Werling specifically challenges the menacing charge relating to the Facebook message sent to A.S. She asserts that there was no testimony that the alleged offense occurred in Fairview Park, that A.S. testified she lived in Lorain, and that the city did not establish venue was proper as to the offense charged. It does not appear from the record that Werling made any objection to venue at trial. When a defendant fails to object to venue at trial, the defendant waives all but plain error. *See State ex rel. Whitt v. Harris*, 2019-Ohio-4113, ¶ 10; *State v. Jackson*,

2014-Ohio-3707, ¶ 142, citing *State v. Weber*, 2013-Ohio-3172, ¶ 33 (2d Dist.). No plain error has been shown.

{¶ 28} As the Supreme Court of Ohio has recognized, "[v]enue is not a material element of the offense charged[,]" but "venue is a fact that must be proved beyond a reasonable doubt unless it is waived by the defendant." *Jackson* at ¶ 143, citing *State v. Smith*, 87 Ohio St.3d 424, 435 (2000); *State v. Draggo*, 65 Ohio St.2d 88, 90 (1981). Further, "venue 'need not be proved in express terms so long as it is established by all the facts and circumstances in the case.'" *State v. Smith*, 2024-Ohio-5030, quoting *State v. Headley*, 6 Ohio St.3d 475, 477 (1983).

{¶ 29} Pursuant to R.C. 2901.12(H), "When an offender, as part of a course of criminal conduct, commits offenses in different jurisdictions, the offender may be tried for all of those offenses in any jurisdiction in which one of those offenses or any element of one of those offenses occurred." "Thus, as long as there was evidence from which the trial court could have determined beyond a reasonable doubt that one of the alleged offenses was committed in Cuyahoga County as part of a course of criminal conduct, then venue was properly established." *Jackson* at ¶ 145, citing *State v. Beuke*, 38 Ohio St.3d 29, 41 (1988). Among other means, prima facie evidence of a course of criminal conduct may be established through proof that the offenses involved the same victim or victims of the same type or from the same group or were committed as part of the same transaction or chain of events or in furtherance of the same purpose or objective. R.C. 2901.12(H)(1) and (3).

**{¶ 30}** Here, A.S. and L.M. worked together at Famous Footwear in Fairview Park, the Facebook message sent to A.S. referenced the incident that occurred at the Fairview Park store and stated, "I hope I never see you out in . . . Fairview Park," and A.S. informed her coworkers about the threatening messages. Because the evidence adduced at trial demonstrated that the course of criminal conduct involved victims from the same group and/or that they were part of the same chain of events with at least one of the offenses occurring in Cuyahoga County, venue was proper. The third assignment of error is overruled.

**{¶ 31}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the municipal court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
SEAN C. GALLAGHER, JUDGE

EILEEN A. GALLAGHER, P.J., and
MICHELLE J. SHEEHAN, J., CONCUR